# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PUEBLO OF ISLETA; | |
| PRAIRIE BAND POTAWATOMI NATION; | |
| CHEYENNE AND ARAPAHO TRIBES; | |
| ELLA BOWEN; | |
| KAIYA BROWN; | |
| DANIELLE LEDESMA; | |
| VICTOR ORGANISTA; | |
| and AIYANNA TANYAN; | |
| *Plaintiffs*, | Case No. _____ |
| v. | |
| SECRETARY OF INTERIOR, DOUG BURGUM; | |
| ASSISTANT SECRETARY – INDIAN AFFAIRS, BRYAN MERCIER; | |
| and | |
| DIRECTOR, BUREAU OF INDIAN EDUCATION, TONY DEARMAN; | |
| *Defendants*. | |

## COMPLAINT

Plaintiffs, three federally-recognized Tribal Nations ("Tribal Nations") and five impacted students ("Individual Students") file this action challenging the Bureau of Indian Education's ("BIE") failure to consult with Tribes and asserting other violations regarding the BIE's reorganization/restructuring ("restructure") and reduction of staff at BIE's central and regional offices and the two BIE-operated post-secondary institutions, Haskell Indian Nations University ("Haskell"), and Southwest Indian Polytechnic Institute ("SIPI"). Plaintiffs seek declaratory and injunctive relief.

## INTRODUCTION

1. The BIE is located within the U.S. Department of the Interior and pursuant to federal treaties, statutes, and the government-government and trust relationship between the United States and Tribes, operates and funds a federal education system. *See* Bureau of Indian Ed., *History*, https://www.bie.edu/topic-page/bureau-indian-education (last visited Mar. 7, 2025).

2. The BIE currently operates 55 elementary and secondary schools and funds another 128 elementary and secondary schools operated by Tribes under contracts and grants that collectively serve about 40,000 students. *Id.* The BIE also operates Haskell and SIPI, which respectively serve approximately 975 and 270 students.

3. BIE's well-documented and persistent inadequacies in operating its schools range from fiscal mismanagement to failure to provide adequate education to inhospitable buildings.

4. Many of the inadequacies are due to BIE understaffing.

5.    Tribal Nations historically have faced great difficulties holding the BIE accountable for these inadequacies and for other critical aspects and components of education and services that BIE schools are supposed to provide.

6.    To address BIE's inadequateness and lack of accountability, Congress has enacted strong and unequivocal tribal consultation laws. *See* 25 U.S.C. §§ 2003 and 2011. Consultation with tribes is required under these laws before action is taken regarding the BIE and BIE schools. *See* 25 U.S.C. § 2011(b)(1) ("All actions under this Act shall be done with active consultation with tribes[.]"); 25 U.S.C. § 2003 (incorporating 25 C.F.R. § 32 (1987)); 25 C.F.R. § 32.4 (a) (1) (1987) ("[N]o new policy shall be established nor any existing policy changed or modified without consultation with affected Tribes[.]").

7.    Upon taking office on January 20, 2025, President Donald J. Trump issued a memorandum initiating a hiring freeze that halted hiring of vacant federal civilian positions. *Memorandum of January 20, 2025: Hiring Freeze*, 90 Fed. Reg. 8247 (Jan. 28, 2025)**.** On January 28, 2025, federal employees received notice of a Deferred Resignation Program, urging them to resign so their positions could be re-assigned or eliminated. Emily Davies et al., *White House incentivizes federal workers to resign*, Politics (Jan. 28, 2025), https://www.washingtonpost.com/politics/2025/01/28/trump-emails-workforce/. And on February 11, 2025, President Trump called on Agency Heads to initiate large-scale reductions in force ("RIFs") and to develop Agency Reduction and Reorganizations Plans. Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 14, 2025) ("Executive Order 14,210").

3

8.      In February 2025, without consulting with Tribal Nations, BIE instituted RIFs and laid off employees throughout BIE central and regional offices, Haskell, and SIPI. These RIFs restructured the services offered throughout BIE operations.

9.      Haskell and SIPI were immediately and severely impacted by these cuts. Instructors were laid off, student services were reduced or discontinued, and custodial and maintenance services were degraded throughout both campuses.

10.      Tribal Nations, schools, students, parents and families were affected.

11.      On February 26, 2025, the Office of Management and Budget ("OMB") issued guidance on Executive Order 14,210 directing Agency Heads to undertake preparations to initiate further large-scale RIFS and to develop Agency Reorganization Plans no later than March 13, 2025. Off. of Mgmt. & Budget, Exec. Off. of the President, *Guidance on Agency RIF and Reorganization Plans Requested by* Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative (Feb. 26, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

12.      The BIE RIFs and restructuring were actions taken without consultation in violation of the tribal consultation requirements and also violated other BIE statutory obligations and the rights of Tribal Nations and students.

13.     The BIE RIFs and restructuring were agency actions in violation of 25 U.S.C. §§ 2003 and 2011, were arbitrary and capricious, and were an abuse of agency discretion.

14.     The Tribal Nations seek a declaratory judgment that the BIE RIFs and restructuring were in violation of tribal consultation rights under 25 U.S.C. §§ 2003 and 2011(b).

15.     The Tribal Nations and Individual Students seek a declaratory judgment that the BIE RIFs and restructuring were in violation of obligations and rights under 25 U.S.C. §§ 2003 and 2011, including Tribal rights to exercise control of priority-setting and staffing at BIE schools, Native students' rights to quality education, and rights to safe and secure school environments.

16.     The Tribal Nations request a preliminary injunction vacating the BIE decisions already made and actions taken in violation of the Tribal consultation requirements under 25 U.S.C. §§ 2003 and 2011(b); to cease future BIE decisions and actions that are in violation of the Tribal consultation requirements; and requiring BIE to consult with Tribal Nations as required by law.

17.     The Tribal Nations and Individual Students request a permanent injunction barring further RIFs and restructuring that result in unlawful outcomes for Tribes and Native American students.

## PARTIES

*Tribal Plaintiff - Pueblo of Isleta*

18.    Plaintiff Pueblo of Isleta is a federally recognized Tribal Nation. 89 Fed. Reg. 99901 (Dec. 11, 2024). The Pueblo of Isleta is in the Rio Grande valley just south of Albuquerque, New Mexico. Isleta is located less than an hour from SIPI and has had tribal members attend both SIPI and Haskell. The BIE also operates the Isleta Elementary School on the Isleta Pueblo.

*Tribal Plaintiff – Prairie Band Potawatomi Nation*

19.    Plaintiff Prairie Band Potawatomi Nation ("Prairie Band") is a federally recognized Tribal Nation. 89 Fed. Reg. 99901 (Dec. 11, 2024). Prairie Band resides on a reservation in east-central Kansas, less than an hour's drive from Haskell. At least 23 Prairie Band students attend Haskell.

*Tribal Plaintiff – Cheyenne and Arapaho Tribes*

20.    Plaintiff Cheyenne and Arapaho Tribes is a federally recognized Tribal Nation located in western Oklahoma. 89 Fed. Reg. 99899 (Dec. 11, 2024). Several Cheyenne and Arapaho students attend Haskell as well as the BIE operated Riverside Indian School in Anadarko, Oklahoma.

*Individual Student Plaintiffs*

21.    Individual Student Ella Bowen is an enrolled member of the Sault Ste. Marie Tribe of Chippewa Indians and is a freshman at Haskell.

22.    Individual Student Kaiya Brown is an enrolled member of the Navajo Nation and is a first-year, second-trimester student at SIPI.

23.    Individual Student Danielle Ledesma is an enrolled member of the Prairie Band of Potawatomi Nation and is a sophomore at Haskell.

24.    Individual Student Victor Organista is an enrolled member of the Prairie Band of Potawatomi Nation and is a sophomore at Haskell.

25.    Individual Student Aiyanna Tanyan is an enrolled member of the Seminole Nation of Oklahoma and is a junior at Haskell.

*Defendants*

26.    Defendant Doug Burgum is the Secretary of the Interior, the agency head who oversees the Assistant Secretary for Indian Affairs.

27.    Defendant Bryan Mercier is the Assistant Secretary for Indian Affairs, who directly oversees and manages the BIE.

28.    Defendant Tony Dearman is the Director of the BIE, who is responsible for the direction and management of all education functions, including forming and implementing policies and procedures, supervising all program activities, overseeing schools, and approving the expenditure of funds appropriated for education functions.

**JURISDICTION AND VENUE**

29.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1362. It is a civil action brought by federally recognized American Indian/Alaska Native Tribal Nations and it arises under federal law, including 25 U.S.C. §§ 2003 and 2011.

30.    The Administrative Procedure Act ("APA"), 5 U.S.C. § 702, waives Defendants' sovereign immunity in this action for claims brought under the APA and non-APA statutes including 25 U.S.C. §§ 2003 and 2011.

31.     This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority to issue equitable relief. Injunctive relief is also authorized for claims under the APA. 5 U.S.C. §§ 705-706. A preliminary and permanent injunction may be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 65.

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because this is an action in which Defendants are officers and employees of the United States acting in official capacities and a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred within this judicial district.

## FACTUAL ALLEGATIONS

### Indian Education Inadequacies and BIE's Efforts to Improve

33.     The United States affirmatively recognizes and supports the sovereignty and Self-Determination of tribes. *See* Indian Self-Determination and Education Assistance Act of 1975, Pub. L. No. 93-638, 88 Stat. 2203 (1975). Congress also recognizes that

> the Federal Government has the sole responsibility for the operation and financial support of the Bureau of Indian Affairs funded school system that it has established on or near Indian reservations and Indian trust lands throughout the Nation for Indian children . . . [and a] unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children and for the operation and financial support of the Bureau of Indian Affairs-funded school system[.]

Pub. L. No. 95-561 (1978) (codified as amended at 25 U.S.C. § 2000, et seq.). This federal obligation entails "work[ing] in full cooperation with tribes." 25 U.S.C. § 2000.

34.     25 U.S.C. § 2000, et seq., codified the statutory framework governing the Bureau of Indian Affairs funded schools, and since 2006 the framework is implemented by the BIE. Bureau of Indian Ed., *History*, https://www.bie.edu/topic-page/bureau-indian-education (last visited Mar. 7, 2025).

35.     The 183 BIE operated and funded elementary and secondary schools are located on 64 Indian reservations in 23 states. *Id.* The BIE also operates or funds off-reservation boarding schools like Riverside Indian School and peripheral dormitories near reservations for public school students. *Id.*

36.     In addition to operating Haskell and SIPI, the BIE also serves American Indian and Alaska Native post-secondary students nationwide through higher education scholarships and support funding for tribal colleges and universities. *Id.*

37.     A litany of renowned reports detail historic and persistent deficiencies in Indian education. *See, e.g.,* Lewis Meriam, et. al., *The Problem of Indian Administration* 1928), *available at* https://narf.org/nill/resources/meriam.html; *Indian Education: A National Tragedy – A National Challenge (Kennedy Report)*, S. Rep. No. 91-501 (1969), *available at* https://narf.org/nill/resources/education/reports/kennedy/toc.html; Alden Woods, *The Federal Government Gives Native Students and Inadequate Education, and Gets Away With It*, PROPUBLICA (Aug. 6, 2020), https://www.propublica.org/article/the-federal-government-gives-native-students-an-inadequate-education-and-gets-away-with-it.

38.     Since 2013, the Government Accountability Office ("GAO") has issued 24 reports and made 38 recommendations about the BIE and BIE schools. U.S. Gov't

Accountability Off., *GAO-25-108103, Bureau of Indian Education: Greater Progress Needed to Address Remaining Challenges in Supporting and Overseeing Schools* 1 (2025), https://www.gao.gov/assets/gao-25-108103.pdf.

39.    These and other reports have identified extensive systemic problems within and with the BIE. *See, e.g.*, U.S. Gov't Accountability Off., *GAO-15-121, Indian Affairs: Bureau of Indian Education Needs to Improve Oversight of School Spending* (2014), https://www.gao.gov/assets/gao-15-121.pdf; U.S. Gov't Accountability Off., *GAO-17-421, Indian Affairs: Further Actions Needed to Improve Oversight and Accountability for School Safety Inspections* (2017), https://www.gao.gov/assets/gao-17-421.pdf; U.S. Gov't Accountability Off., *GAO-20-358, Indian Education: Actions Needed to Ensure Students with Disabilities Receive Special Education Services* (2020), https://www.gao.gov/assets/gao-20-358.pdf; Alden Woods, *The Federal Government Gives Native Students and Inadequate Education, and Gets Away With It*, supra.

40.    Many of the GAO's recommendations over the last decade have focused on the BIE's inadequate staffing.

41.    In 2014, the GAO directed the revision of a strategic workforce plan to ensure that BIE has adequate staff with the requisite knowledge and skills to effectively oversee BIE school expenditures. U.S. Gov't Accountability Off., *GAO-15-121, Indian Affairs: Bureau of Indian Education Needs to Improve Oversight of School Spending* at 34.

42.    In 2016, the GAO directed the development of a plan to build the BIE's and BIE schools' capacity to promptly address safety and health problems with facilities.

U.S. Gov't Accountability Off., *GAO 16-313, Indian Affairs: Key Actions Needed to Ensure Safety and Health and Indian School Facilities* 28 (2016), https://www.gao.gov/assets/gao-16-313.pdf. In the same report, the GAO explained that "Indian Affairs and school officials across several regions said that limited staff capacity, among other factors, impedes schools' ability to address safety deficiencies." *Id.* at ii.

43.    In 2020, the GAO directed the BIE to "update the agency's workforce plan to include a strategy and timeframe for filling vacant staff positions responsible for overseeing and supporting schools' special education programs." U.S. Gov't Accountability Off., *GAO-20-358, Indian Education: Actions Needed to Ensure Students with Disabilities Receive Special Education Services* 29-30 (2020), https://www.gao.gov/assets/gao-20-358.pdf.

44.    And, in 2024, the GAO directed the BIE to "update its strategic workforce plan to build its capacity to conduct all annual fiscal reviews . . . required by its policy." U.S. Gov't Accountability Off., *GAO-24-105451, Bureau of Indian Education: Improved Oversight of Schools' COVID-19 Spending is Needed* 24-25 (2024), https://www.gao.gov/assets/gao-24-105451.pdf.

45.    Also, in June 2022 and April 2023 reports, the GAO called attention to vacancy rates at BIE of 33 percent and 27 percent respectively. U.S. Gov't Accountability Off., *GAO-22-106104, High-Risk: Bureau of Indian Education Has Addressed Some Management Weaknesses, but Additional Work is Needed on Others* 9 (2022), https://www.gao.gov/assets/gao-22-106104.pdf; U.S. Gov't Accountability

Off., *GAO-23-106203, High-Risk Series: Efforts Made the Achieve Progress Need to Be Maintained and Expanded to Fully Address All Areas* 102 (2023), https://www.gao.gov/assets/gao-23-106203.pdf#page110.

46.    In the June 2022 report, the GAO stated:

As of May 2022, BIE's overall staff vacancy rate is about 33 percent. This is the same vacancy rate we reported in our 2021 High-Risk Report. Furthermore, BIE's School Operations Division, which provides vital administrative support to schools, has a vacancy rate now of about 45 percent. We believe that high staff vacancy rates significantly inhibit BIE's capacity to support and oversee schools.

U.S. Gov't Accountability Off., *GAO-22-106104, High-Risk: Bureau of Indian Education Has Addressed Some Management Weaknesses, but Additional Work is Needed on Others* 9.

47.    As recently as February 12, 2025, the GAO issued an updated report and identified that progress has been made but cautioned that additional oversight and staffing is necessary to continue BIE progress. U.S. Gov't Accountability Off., *GAO-25-108103, Bureau of Indian Education: Greater Progress Needed to Address Remaining Challenges in Supporting and Overseeing Schools* 7 (2025), https://www.gao.gov/assets/gao-25-108103.pdf.

48.    The 2025 report explains that

[b]uilding staff capacity has been a challenge for BIE for over a decade. We have found that BIE's insufficient staff capacity has limited its ability to monitor schools' federal spending and assist schools with their special education programs. BIE has taken steps to address this issue . . . However, BIE's capacity issues have persisted. For example, in 2020 we found it did not have sufficient staff to monitor special education services at all schools to ensure students with disabilities receive these services as required by law. Also, in 2024 we found that BIE did not have sufficient staff to complete all required monitoring of schools it designated as at a high risk of financial mismanagement over the last year.

U.S. Gov't Accountability Off., *GAO-25-108103, Greater Progress Needed to Address Remaining Challenges in Supporting and Overseeing Schools* 10 (2025), https://www.gao.gov/assets/gao-25-108103.pdf.

49.     Reports have likewise recognized deficiencies in staffing at Haskell and SIPI. For example, House Report 105-700, titled "Haskell Indian Nations University and Southwestern Indian Polytechnic Institute Administrative Systems Act of 1998," identifies significant deficiencies at both institutions. This includes: lack of adequate staffing levels highlighting serious shortages in faculty and administrative personnel, which negatively impacted their ability to provide quality education and services; difficulty in hiring and retaining qualified staff noting both institutions struggle to attract and keep skilled educators and administrators, leading to gaps in instructional quality and institutional stability; and administrative challenges resulting in lack of sufficient administrative personnel placing an additional burden on existing staff, leading to inefficiencies in academic and student support services. H.R. Rep. No. 105-700 , pt. 1 (1998).

50.     The hearing titled "Investigating how the Biden Administration Ignored Cries for Help from Students at Haskell Indian Nations University," held on July 23, 2024, brought to light several staffing-related issues impacting the university's operations and student welfare. Key concerns included: leadership instability contributing to administrative instability at the institution; staffing shortages and resource limitations highlighting chronic understaffing and inadequate resources, which adversely affected the university's ability to support students effectively; and

administrative oversight and support examining how administrative decisions and policies from the BIE may have impacted staffing and resources at the university. These staffing challenges were central to the concerns raised during the hearing, reflecting broader issues within the institution's administration and its capacity to serve its student population effectively. *Investigating how the Biden Administration Ignored Cries for Help from Students at Haskell Indian Nations University: Hearing Before the Subcomm. on Oversight of the H. Comm. on Nat. Res.*, 118th Cong. (2024), *recording available at* https://www.youtube.com/watch?v=SHstjUJrPog.

51.    The most recent BIE "Strategic Direction" in force was the *2018-2023 Strategic Direction*. While the BIE held consultations on its *2024-2029 Strategic Direction*, it has not yet been implemented.

52.    The *2018-2023 Strategic Direction* describes, crucially, the Bureau's goal to achieve an "employee system of support," which it defines as:

> A system that goes beyond evaluation to build a foundation of growth, continuous learning and supports to recruit, hire and retain high-quality staff with the capacity to carry out the organization's mission. . . . There are clear procedures for hiring, advancement and dismissal of employment.

Bureau of Indian Ed., *2018-2023 Strategic Direction* 33, 66 (Aug. 16, 2018), *available at* https://www.bie.edu/sites/default/files/documents/idc2-086443.pdf.

53.    For the accomplishment of the BIE's goal of high academic standards in K-12 instruction, the *2018-2023 Strategic Direction* advances a strategy of "recruitment" of principals, teachers, and staff. *Id.* 22.

54.    And BIE set a "milestone" guideline for itself to measure its progress towards this strategy, asking whether the BIE "has reviewed, developed and/or

revised guidance on how to effectively utilize federal funds to hire highly effective principals, teachers, and staff. . ." *Id.* at 42.

55.     Similarly, BIE set a "strategy" of "leverage[ing] Haskell Indian Nations University and Southwestern Indian Polytechnic Institute as options for postsecondary education" to achieve its mission towards post-secondary and career readiness. *Id.* 28.

56.     To measure its own progress towards this strategy, BIE crafted milestones clearly aimed at increasing enrollment at Haskell and SIPI though purposeful, affirmative engagement with Tribes. *Id.* 44.

57.     BIE has taken steps to address these failings and staffing shortfalls. For example, for Fiscal Year 2025, the Department of Interior requested a $154.6 million increase to the budget, which included key funding for increased staffing. *Hearing on the 2025 President's Budget Request for Indian Affairs Programs* before the S. Comm. on Interior, Environ., and Related Agencies Comm. on Appropriations, 118th Cong. 7 (2024) (statement of Bryan Newland Asst. Sec. - Indian Affairs Dept. of the Interior) https://www.appropriations.senate.gov/imo/media/doc/download_testimony76.pdf.

## Reorganization / Restructuring of BIE Workforce

58.     Immediately upon taking office, President Trump's Administration worked to re-make the federal workforce. On January 20, 2025, President Trump issued a Presidential memorandum initiating a federal hiring freeze. *Memorandum of January 20, 2025: Hiring Freeze*, 90 Fed. Reg. 8247 (Jan. 28, 2025).

59.    Without Tribal consultation, on January 28, 2025, the Office of Personnel Management ("OPM") offered federal workers the option to resign and be placed on paid administrative leave until September 30, 2025. Workers that resigned under this option are not required to fulfill their job responsibilities during their period of administrative leave. Off. of Personnel Mgmt., *Deferred Resignation Email to Federal Employees* (Jan. 28, 2025), https://www.opm.gov/fork/original-email-to-employees/; Davies et al., *White House incentivizes federal workers to resign,* supra.

60.    OPM stated that the reason the program was developed was because the "federal workforce is expected to undergo significant near-term changes. As a result of these changes (or for other reasons), you may wish to depart the federal government on terms that provide you with sufficient time and economic security to plan for your future." Off. of Personnel Mgmt., *Frequently Asked Questions,* OPM.GOV, *available at* https://www.opm.gov/fork/faq/.

61.    BIE has not filled any of the positions vacated by the voluntary resignation program.

62.    On February 11, 2025, President Trump issued Executive Order 14,210 entitled *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative.* Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb 14, 2025). This Executive Order called for reforming the federal workforce and implementing "large-scale reductions in force (RIFs)[.]"

63.    On or around February 13 and February 14, 2025, only one or two days after release of the February 12, 2025, GAO report that detailed additional resources and

staffing are needed to meet BIE's mission, BIE staff began letting go trial and probationary personnel at its central and regional offices and at Haskell and SIPI ("BIE RIFs").

64.     On February 26, 2025, OMB issued guidance on Executive Order 14,210 directing Agency Heads to undertake preparations to initiate further large-scale RIFS and to develop Agency RIF and Reorganization Plans ("ARRP") no later than March 13, 2025. Off. of Mgmt. & Budget, Exec. Off. of the President, *Guidance on Agency RIF and Reorganization Plans Requested by* Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative (Feb. 26, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

65.     All agencies are expected to complete these ARRPs, although agencies that provide direct services to citizens should hold implementation until "OMB and OPM certify that the plans will have a positive effect on the delivery of such services." *Id.*

66.     The OMB February 26 guidance explained that agencies should "[c]ontinu[e] to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart." *Id.*

67.     On March 4, 2025, OPM issued another memo entitled "Guidance on Probation Periods, Administrative Leave and Details clarifying that with regard to

probationary employees "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions." This memo did not clarify whether agencies that had terminated probationary personnel could re-hire laid off employees. Off. of Personnel Mgmt., Exec. Off. of the President, *Guidance on Probationary Periods, Administrative Leave and Details* 2 (March 4, 2025), https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf.

### Failure to Consult

68.   DOI has several policies to ensure compliance with 25 U.S.C. §§ 2011 and 2003 Tribal consultation requirements.

69.   Defendant Mercier is responsible for ensuring that the BIE follows its tribal consultation policy. Bureau of Indian Affs., *Indian Affairs Manual* pt. 18 ch. 6 § 1.5 (A)(1) (Dec. 26, 2024) ("Regulatory Affairs and Collaborative Action: Tribal Consultation Process"), https://www.bia.gov/sites/default/files/dup/assets/public/raca/manual/pdf/18_iam_6_tribal_consultation_process_final_asiasigned_12.26.24_w.footers_508.pdf.

70.   Defendant Dearman is responsible for "ensuring consultation occurs early in the process (i.e., as soon as realistically possible once [Indian Affairs] identifies a project, approach, or regulation that may potentially impact Tribal lands, people, programs, or rights)." *Id.* at § 1.5 (B)(4).

71.   DOI's policy requires it to "consult with tribes on a government-to-government basis whenever DOI plans or actions have tribal implications" and

18

further mandates that "[a]ll bureaus and offices shall comply with and participate in the consultation process in a manner that demonstrates a meaningful commitment and ensures continuity in the process." Dept. of the Interior, *DOI Policy on Consultation with Indian Tribes and Alaska Native Corporations,* pt. 512 ch. 4 (Nov. 9, 2015), https://www.doi.gov/sites/doi.gov/files/512-dm-4-department-of-the-interior-policy-on-consultation-with-indian-tribes.pdf.

72.    Indian Affairs' policy is

to facilitate meaningful consultation with Tribes in order to: ensure Tribal impacts and concerns are heard and respected as part of IA's commitment to honoring its nation-to-nation relationship with Tribes; acknowledge the United States' treaty and trust responsibilities to Tribal Nations; and facilitate compliance with all applicable laws and regulations as well as with Department of the Interior ("DOI") policies and procedures regarding Tribal consultation.

Bureau of Indian Affs., *Indian Affairs Manual* pt. 18. ch. 6 § 1.3.

73.    At no time prior to the February 2025 RIFs did BIE engage in consultation with Tribal Nations.

74.    Following issuance of OPM's February 26, 2025, guidance directing Agency Heads to undertake preparations to initiate further large-scale RIFs and to develop ARRPs by March 13, 2025, the Tribal Nations have not received a notice of consultation about the ARRP.

75.    As of March 7, 2025, the BIE's agency website page on consultation lists no upcoming consultations. Bureau of Indian Ed., *Consultations and Initiatives,* https://www.bie.edu/consultations-initiatives (last visited Mar. 7, 2025).

**Post Implementation Consultation**

76.    Some Native education associations have received notice of a BIE consultation about the impacts of the BIE RIFs that have already been implemented. The Tribal Nations, however, have not received notice of this consultation.

77.    In any event, consultation to discuss the consequences of decisions that already have been made and actions that already have been taken does not constitute meaningful tribal consultation consistent with legal requirements. *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1058-59 (D.S.D. 2016).

78.    If the Tribal Nations had been offered an opportunity to consult on the BIE RIFs, restructuring, or the ARRPs, they would have taken it.

### BIE RIFs at BIE Central and Regional Offices

79.    Between the evenings of February 13, and February 14, 2025, BIE leadership and staff notified approximately 22 BIE employees that their positions were terminated.

80.    These employees were given a few hours to pack their belongings and vacate the premises. They were not provided with an opportunity to finish or transition their workloads.

81.    Approximately 5 of these staff members were in the central BIE office. The remaining approximately 17 employees were in regional roles.

82.    Positions eliminated included school safety specialists, fiscal auditors, financial analysts, accountants, human resource officers, management analysts, and IT personnel, among others.

83. The laid off employees were not let go based on their performance of their duties.

84. The loss of staff required BIE to forgo or reassign work to other staff.

85. This abandonment of services and reassignment of tasks restructured BIE.

86. Given the numerous GAO reports that have recommended additional BIE oversight and staffing, in particular in the fields of the laid off employees such as safety specialists and fiscal auditors, these losses set back BIE's progress.

### BIE RIFs at BIE Schools

87. Among BIE's operated schools is Isleta Elementary School, which is located on Plaintiff Pueblo of Isleta's reservation.

88. The Pueblo of Isleta's Department of Education coordinates with BIE to provide culturally sensitive curriculum and language education to the tribal children who attend the school.

89. Approximately half of the staff of Isleta Elementary School are Isleta tribal members.

90. Tribal members are fearful that the reduction of staff at BIE, or the plan for future staff reductions, will impact Isleta Elementary School.

91. Isleta Elementary School, like many other BIE schools, has traditionally struggled to maintain sufficient staffing.

92. If Isleta Elementary School is closed or its ability to educate its current students reduced, students would be forced to attend schools away from the Pueblo.

93.    Students have reported experiencing racism when attending schools away from the Pueblo.

94.    The Pueblo of Isleta was never provided the opportunity to consult with BIE about staff reductions, restructuring, or reduced or eliminated education.

95.    The Executive Director of Isleta's Department of Education first had to learn about the BIE staff reductions in the news.

96.    If provided the opportunity, the Pueblo of Isleta would have attended Tribal consultations and urged against reduction or elimination of BIE staff and education.

**BIE RIFs at Haskell**

97.    The BIE operates Haskell in "partial fulfillment of the trust responsibility between the United States and Indian Country." Haskell University, *Haskell History*, https://haskell.edu/about/history/ (last visited Mar. 7, 2025).

98.    The mission of Haskell is to "build the leadership capacity of our students by serving as the leading institution of academic excellence, cultural and intellectual prominence, and holistic education that addresses the needs of Indigenous communities."    Haskell    University,    *Mission    Statement*, https://haskell.edu/about/vision/ (last visited Mar. 7, 2025).

99.    Haskell offers associate degree programs in Communications Studies, Liberal Arts, Media Communication, Para Professional Education, Social Work, Community Health, Health, Sports and Exercise Science, Natural Sciences, and Recreation Fitness Management. Haskell offers Baccalaureate Degree Programs in

Business Administration, Elementary Education, Environmental Studies, and Indigenous Arts and American Indian Studies. Haskell University, *Associate Degree Programs*, https://haskell.edu/academics/associate-degree-programs/ (last visited Mar. 7, 2025).

100.   Haskell hosts cultural and academic events such as Haskell's Indian Art Market, Stories-n-Motion Film Festival, and the Haskell Commencement and Pow-wow.

101.   Twelve Haskell campus buildings have been designated as U.S. National Historic Landmarks and the Rinehart art collection is housed in the Haskell cultural center.

102.   Prior to February 13, 2025, Haskell had approximately 179 total staff and served approximately 975 Native American and Alaska Native students per year.

103.   Between the evenings of February 13 and February 14, 2025, BIE leadership and staff notified approximately 37 Haskell employees that their positions were terminated.

104.   These employees were given a few hours to pack their belongings and vacate the premises. They were not provided with an opportunity to finish or transition their workloads.

105.   These staff members provided essential services to the Haskell University student body.

106.   Fourteen of these eliminated positions were student facing, including seven instructors.

107.    This resulted in 34 academic courses losing an instructor.

108.    Twelve of the eliminated positions performed administrative tasks and 11 performed operational duties.

109.    Terminated positions included the Dean of Students, instructors, property management specialists, coaches, tutors, residential advisors, academic advisors, custodians, and food services employees, among others.

110.    An additional 11 staff from Haskell were induced to resign through the resignation option.

111.    In total, in February 2025, Haskell lost over a quarter of its staff.

112.    The laid off employees were not let go based on performance of duties.

113.    Haskell is accredited by the Higher Learning Commission ("HLC"), which sets specific standards for accreditation to ensure that institutions of higher education meet academic and operational requirements. *See* 25 U.S.C. § 2001. These standards cover multiple areas, such as mission and integrity, student learning and resources, and institutional effectiveness.

114.    Personnel reductions may impact Haskell's accreditation if it impacts the institution's ability to provide quality education, meet student needs, or maintain operational effectiveness. Higher Learning Commission, *Current Criteria for Accreditation* (2020), https://www.hlcommission.org/accreditation/policies/criteria/2020-criteria/ (last visited Mar. 7, 2025).

115.    These losses imperil the continued ability to function and accreditation of Haskell.

116.    At no time were Tribal Nations or affected students offered an opportunity to consult on these changes at Haskell.

117.    At minimum, due to these staff reductions, services provided to Haskell students have been modified, curtailed, or eliminated and are in danger of being eliminated permanently.

**Harms to Student Life, Academics, Student Services,
and Tribal Interests Resulting from RIFs at Haskell**

118.    On the day of the BIE RIFs on February 14, 2025, *The Indian Leader*, Haskell's student newspaper reported:

> For [Haskell] students, the effects are immediately visible. Several courses are now left without their original instructors, putting students' educational experience in jeopardy. While some faculty members are being asked to take on additional classes to cover the vacancies, this has put an immense strain on the remaining staff. Teachers are now burdened with larger workloads, and the quality of education is at risk as educators juggle responsibilities beyond their capacity.

Tara Roanhorse, *Haskell Indian Nations University Faces Major Staffing Cuts, Students Left Without Teachers*, THE INDIAN LEADER (Feb. 14, 2025), https://theindianleader.com/2025/02/14/haskell-indian-nations-university-faces-major-staffing-cuts-students-left-without-teachers/.

119.    Reaction to the Haskell staff firings was swift, with students, alumni, leadership, and Tribal communities condemning the BIE RIFs and expressing shock, dismay, and worry. Haskell Faculty Senate (public statement), *Haskell Faculty: Trail of broken treaties continues with mass terminations at tribal college*, INDIANZ.COM (Feb. 21, 2025),        https://indianz.com/News/2025/02/21/haskell-faculty-trail-of-broken-treaties-continues-with-mass-terminations-at-tribal-college/;    Jourdan    Bennett-

Begaye and Kevin Abourezk, *'Devastated and heartbroken': Federal layoffs have Haskell,*
*SIPI wrestling with their future*, INDIAN COUNTRY TODAY (Feb 17, 2025),
https://ictnews.org/news/devastated-and-heartbroken-federal-layoffs-could-force-
haskell-sipi-to-close.

120.     Immediately impacting Haskell student life on campus, the student's
Welcome Back Powwow has been postponed due to the layoffs.

121.     *The Leader* notes that the

> event [] has become an essential tradition for [Haskell] students. For many
> students, this powwow is more than just a social gathering; it's an
> important reminder of their identity and the cultural support they need
> while navigating the challenges of college life.

Tara Roanhorse, *Haskell Indian Nations University Faces Major Staffing Cuts, Students*
*Left Without Teachers*, supra.

122.     Further, other student activities such as Haskell intramural volleyball,
basketball, and softball leagues have all been cancelled.

123.     Plaintiff Victor Organista planned to participate in these activities but now
will be unable to do so.

124.     Likewise, the Haskell Student Success Center has been shuttered. The
mission of the Haskell Student Success Center is to provide centralized, accessible,
and enriched academic services and programs to support and enhance the academic,
cultural and career success of Haskell Students. It offers services such as workshops
on time management, study skills and test taking skills, and it serves as a place to
answer student questions. It houses mental health coaching staff, who provide

resources and support to struggling students. It also assists students in applying for and maintaining access to financial aid.

125.    Haskell students have also reported that their financial aid has been delayed.

126.    For some students, financial aid has still not been disbursed.

127.    Plaintiff Ella Bowen, a freshman at Haskell, described how when her financial aid was not disbursed, she was worried about money for laundry and food.

128.    Ms. Bowen's financial aid was ultimately distributed nearly a month late.

129.    Ms. Bowen's academic advisor was fired, and because the Haskell Student Success Center was shuttered she does not know where to go to for assistance if her financial aid is delayed again.

130.    Plaintiff Aiyanna Tanyan, a sophomore at Haskell, has seen significant delays to the distribution of her financial aid.

131.    Like her peers, she requires assistance from the Haskell Student Success Center if her aid continues to be delayed so that her ability to fund her necessary expenses is not compromised.

132.    Plaintiff Danielle Ledesma has also had her financial aid delayed and would similarly require assistance from the Haskell Student Success Center should that continue.

133.    Plaintiff Victor Organista's financial aid has also been delayed and not yet dispersed.

134.   He requires assistance from the Haskell Student Success Center or the financial aid office and FAFSA advisors, but currently there is no faculty to consult.

135.   All but three members of the custodial staff at Haskell were laid off, resulting in less clean buildings and posing a health and safety risk if not mitigated.

136.   Plaintiff Aiyanna Tanyan, a junior at Haskell, observed that after the majority of the custodial staff were fired, campus restrooms are untidy and do not have stocked toilet paper.

137.   The restrooms now often have overflowing trash cans and Ms. Tanyan reports that she has felt compelled to empty overflowing disposal bins for used feminine hygiene products.

138.   Because food service staff were eliminated except for one staffer, students have been forced to work without compensation to keep food services running.

139.   Food services, such as the cafeteria salad bar, have been neglected, leaving students with dietary restrictions or allergies to meat with no vegetarian options.

140.   For those meals that are served, students have observed that portion sizes are reduced.

141.   Reduced food service staff have also caused the cafeteria and lunchroom to become unclean and unwelcoming.

142.   Students who would ordinarily use the lunchroom to spend time speaking with their classmates would now prefer to eat their meals alone in their dorm rooms.

143.   Deans and other faculty have been forced to take over course loads of removed instructors without additional pay and at the expense of their primary

workloads, and Kansas University has sent an instructor over to assist with the class load of a laid off employee.

144.    Plaintiff Victor Organista, a sophomore at Haskell who is seeking a two-year degree in Media Communications, lost his professor who had been teaching three of his classes this semester.

145.    Mr. Organista's professor has not been rehired as an adjunct faculty member.

146.    Instead, Mr. Organista's classes are now being taught by another humanities faculty member, a change which has reduced the quality of Mr. Organista's classroom experience and lowered the quality of instruction in the class subject matters.

147.    Other students have observed that faculty and deans covering classes for their fired colleagues provide a lower quality classroom and teaching experience due to their lack of expertise in the class subject matter.

148.    Although it was recently reported that some fired faculty have been rehired though the end of the semester as adjunct faculty, their firings and the temporary nature of their current stop-gap positions create significant uncertainty about future course offerings at Haskell.

149.    On March 6, 2025, BIE reportedly notified 14 of the terminated Haskell staff members that they will be rehired; however, BIE notified those individuals that this might be temporary, and they may be laid off again.

150.    There are additional staff who have not been rehired including maintenance, custodial, and operations staff, including the only bus driver at Haskell.

151.    Preliminary reporting indicates that the instructor faculty will be rehired on an "adjunct" basis to finish the semester, and the rehiring does not include custodial or operations staff. The Haskell Student Success Center will remain closed. Kevin Abourezk, *Haskell rehires faculty lost to federal layoffs*, INDIAN COUNTRY TODAY (Mar. 6, 2025), https://ictnews.org/news/haskell-rehires-faculty-lost-to-federal-layoffs?fbclid=IwY2xjawI3Y6BleHRuA2FlbQIxMQABHQfXVWkegOXN6ySuOf-OuHHb8JM2Nt3YArgii0LdYW85KHySiWZe2FOLGw_aem_DgFEmYGfeio2Pg5Tk-6-ig.

152.    Additional and permanent rehiring is necessary to get Haskell fully operational.

153.    Plaintiff Danielle Ledesma, who planned to take a summer course with a since laid-off social work professor, is uncertain whether the course will still be offered in the summer.

154.    If the course is not offered, Ms. Ledesma's graduation and degree will be delayed until she can complete the course.

155.    If Haskell loses its accreditation or is not open in the fall, when the course Ms. Ledesma needs for the completion of her degree would normally be offered, Ms. Ledesma would not continue to pursue higher education elsewhere, leaving her without a degree, just one course short.

156.    Similarly, Plaintiff Victor Organista's ability to complete his degree has also been thrown into question by the firings.

157.    Mr. Organista requires several additional media communications classes to complete his degree, all of which would ordinarily be taught by now-fired Professor Robert Hicks.

158.    As of March 5, 2025, Professor Hicks had not been rehired as an adjunct professor.

159.    Instead, Professor Hicks' classes were being taught by other faculty.

160.    It is unknown whether Professor Hicks was re-hired on March 6, 2025.

161.    Because of the firings, Mr. Organista's completion of his degree at Haskell may be delayed or precluded entirely.

162.    Like Ms. Ledesma, Mr. Organista is considering whether to pursue the remainder of his degree at a different institution of higher learning.

163.    Unfortunately, Mr. Organista believes that if he should choose to attend a different institution, his post-secondary educational and community experience would be harmed.

164.    The Prairie Band Potawatomi Nation has at least 23 enrolled members who are students at Haskell, including Plaintiff Victor Organista and Plaintiff Danielle Ledesma.

165.    The Prairie Band Potawatomi Nation was never extended the opportunity to consult on the reductions to staff at BIE or Haskell.

166.    If the Prairie Band Potawatomi Nation had been extended the opportunity to consult on these significant changes at BIE and Haskell it would have opposed the devastating RIFs, restructuring, and impacts to academics and student services.

167.    In addition, if some RIFs were unavoidable and there had been the opportunity to consult, the Prairie Band Potawatomi Nation would have consulted on the Nations' preferences and priorities for which academic programs and services should be protected from such reductions.

168.    As of the date of this filing, the Prairie Band Potawatomi Nation has not received an invitation to consult on the consequences of the RIFs at Haskell.

169.    As of Fall 2024, the Cheyenne and Arapaho Tribes had 35 tribal citizens enrolled at Haskell.

170.    The Cheyenne and Arapaho Tribes offers post-secondary education scholarships to their member students, including students attending Haskell.

171.    The Cheyenne and Arapaho Tribes is concerned that the firings at Haskell have caused classes to be cancelled and will cause future classes to be cancelled or not offered at all, possibly impacting the Tribe's students' full time student status, their eligibility for financial aid, student housing, and the student meal plan.

172.    The Cheyenne and Arapaho Tribes was never extended the opportunity to consult on the reductions to staff at BIE or Haskell.

173.    If Cheyenne and Arapaho Tribes had been extended the opportunity to consult on these significant changes at BIE and Haskell it would have opposed the devastating RIFs, restructuring, and impacts to academics and student services.

174.    In addition, if some reductions in force were unavoidable and there had been the opportunity to consult, Cheyenne and Arapaho would have consulted on its preferences and priorities for which academic programs and services should be protected from such reductions.

175.    Due to the harms to student life, academics, student services, changes that imperil Haskell's accreditation, quality of education, and reputation, both Prairie Band of Potawatomi Nation and Cheyenne and Arapaho Tribes are reluctant to recommend Haskell to its students as a place of higher learning, despite having recommended Haskell to their students in the past.

176.    The inability to recommend Haskell to their students harms Tribal Plaintiffs' interests in the education and welfare of their citizens.

177.    The Cheyenne and Arapaho Tribes is particularly harmed by their inability to recommend Haskell as a post-secondary opportunity to their students because its students do not encounter other comparable, culturally appropriate opportunities in western Oklahoma.

**BIE RIFs at SIPI**

178.    The BIE operates SIPI, which provides science, technology, engineering, and mathematics education, along with other vocational and technical programs to Native American and Alaska Native students.

179.    SIPI's mission is to "prepare[] our culturally diverse Native American students as life-long learners through partnerships with tribes, employers, and other organizations. [SIPI] establish[es] a strong education foundation for student success."

Southwestern Indian Polytechnic Institute, *Our History, Mission & Vision*, SIPI.EDU, https://www.sipi.edu/apps/pages/history (last visited Mar. 7, 2025).

180.    SIPI offers associate degree programs in accounting, business education, computer aided drafting and design, culinary arts, early childhood education, environmental science, geospacial information technology, liberal arts, natural resource management, network management, pre-engineering, and vision care technology. Southwestern Indian Polytechnic Institute, *Programs and Degrees Offered*, SIPI.EDU, https://www.sipi.edu/apps/pages/programs (last visited Mar. 7, 2025).

181.    SIPI has approximately 92 total staff and serves around 270 Native American and Alaska Native students a year.

182.    Between the evenings of Thursday, February 13, and Friday February 14, 2025, BIE leadership and staff notified approximately 18 SIPI employees that their positions were terminated.

183.    These employees were given a few hours to pack their belongings and vacate the premises.

184.    They were not provided with an opportunity to finish or transition their workloads.

185.    These staff members provided essential services to the SIPI student body.

186.    Eleven of these eliminated positions were student facing, including 9 instructors.

187.    At least two of these professors taught core-curriculum classes and their classes remain unstaffed.

188.    An additional 4 staff from SIPI were induced to resign through the resignation option.

189.    In total, over the last month, SIPI has lost nearly a quarter of its staff.

190.    These employees who were laid off were not let go based on performance of duties.

191.    On March 6, 2025, an unknown portion of the staff at SIPI was reportedly re-hired. It is unknown whether these hirings were made on a permanent or temporary basis, whether the titles of those rehired were altered or demoted, and whether the re-hired only included instructors or also included maintenance and custodial staff. Not all employees subjected to the BIE RIFs were rehired.

192.    At no time were Tribal Nations or affected students offered an opportunity to consult on BIEs RIFs or the restructuring of personnel and degradation of services at SIPI.

193.    SIPI is accredited by the Higher Learning Commission ("HLC"), which sets specific standards for accreditation to ensure that institutions of higher education meet academic and operational requirements. *See* 25 U.S.C. § 2001. These standards cover multiple areas, such as mission and integrity, student learning and resources, and institutional effectiveness.

194.    Personnel reductions may impact SIPI's accreditation if it impacts the institution's ability to provide quality education, meet student needs, or maintain operational effectiveness. Higher Learning Commission, *Current Criteria for*

*Accreditation* (2020), https://www.hlcommission.org/accreditation/policies/criteria/2020-criteria/ (last visited Mar. 7, 2025).

195.    These losses imperil the continued ability to function and accreditation of SIPI.

196.    At minimum, due to these staff reductions services provided to SIPI students will be modified, curtailed, or eliminated.

### Harms to Student Life, Academics, Student Services, and Tribal Interests Resulting from RIFs at SIPI

197.    Plaintiff Kaiya Brown, a first-year student at SIPI currently in her second trimester, has observed that the firing of SIPI staff has disrupted her classes.

198.    Due to widespread confusion and fear resulting from the firings, several of Ms. Brown's classes have been spent exchanging information on the firings and status of SIPI between students and teachers.

199.    In fact, the first day of class after the firings, Ms. Brown's instructors asked Ms. Brown and other students what they knew about the situation, spending valuable instruction time discussing the firings and the future of SIPI.

200.    The firing of maintenance and security staff has also made SIPI's campus physically unsafe and unusable.

201.    Since February 14, 2025, Ms. Brown's education has been impacted by two power outages on SIPI's campus.

202.    The outages went unresolved due to the lack of maintenance staff available to restore the electricity.

203. During the first power outage, Ms. Brown's dorm residence was without power for 13 hours.

204. Ms. Brown was forced to leave her dorm residence and drive to a second location to be able to complete her school assignments.

205. The second power outage was campus-wide and caused classes to be cancelled.

206. Due to the firings, class cancellation was not effectively communicated to instructors.

207. Other maintenance issues have gone unaddressed or were addressed on a delayed schedule because of the lack of maintenance staff, including a burst water line, which has caused two SIPI campus buildings to be without running water for three days and counting.

208. Repairs for other maintenance issues, which SIPI maintenance and administration had intended to address, have now been set aside indefinitely.

209. For example, water from taps, showers, and laundry machines in Ms. Brown's dorm building is regularly unsafe and appears brown or black in color.

210. As a result, Ms. Brown does not drink water from her dorm building, does not cook in her dorm kitchen, and does not do laundry at her dorm.

211. Before the firings, Residential Advisors promised Ms. Brown and others that SIPI would fix the problem.

212. But now, after the firings, those same Residential Advisors have told Ms. Brown and other dorm residents that the problem likely won't be fixed any time soon due to the lack of available staff.

213. The firings have also negatively impacted SIPI students' access to extracurricular opportunities.

214. For example, SIPI notified its planned student delegation to the American Indian Higher Education Consortium ("AIHEC") annual student conference, which will be held March 8-11, that they could no longer attend.

215. The delegation was subsequently notified that they could go, but were given only two days' notice before the event, effectively precluding them from making plans to travel and miss school and work.

216. Ms. Brown and other students are missing out on a highly anticipated networking opportunity, for which she and others have already invested significant time in preparation.

217. The firings at SIPI occurred the week before midterm exams.

218. As a result, many students' midterm exams had no faculty to administer them.

219. However, despite being fired from their positions and receiving no compensation for their work, fired instructors nevertheless volunteered their time to administer students' midterm exams.

220.    Midterm exams represent important milestones in students' course completion and serve as crucial benchmarks for students to measure their progress and learning.

221.    Ms. Brown and other students, motivated by their exceptionally close and personal relationships with faculty and staff, started GoFundMe fundraisers so that the fired faculty members could pay their expenses.

222.    If Ms. Brown and other students had not started these successful fundraisers to permit their fired faculty to pay their expenses, the fired faculty would not have had been able to volunteer their time to administer the students' midterm exams.

223.    As a result of the firings, Ms. Brown, who is currently pursuing a two-year degree in early childhood education and liberal arts, had experienced significant burdens on her ability to complete her academic tasks.

224.    Ms. Brown chose to attend SIPI because of its indigenous learning community.

225.    Ms. Brown has found a vibrant and incredibly close-knit community at SIPI and has benefitted from the indigenous learning community and indigenous lens.

226.    Ms. Brown was devastated by the firings. She has begun to seek mental health counseling to protect her mental wellbeing.

227.    Ms. Brown's ability to complete her coursework and attend class has been negatively affected by the firings' impact on her mental health.

228.    Ms. Brown is aware that since the firings, some of her peers have struggled with suicidal thoughts and suicidal ideation.

229.    The firings at SIPI have so significantly harmed the academic experience at SIPI that Ms. Brown describes the opportunity to pursue a Native-led post-secondary education as being "robbed" from her.

230.    The Pueblo of Isleta's Department of Education ordinarily consults with SIPI to discuss curriculum that would be useful to the Pueblo, and the Isleta Department of Education routinely advises its tribal members of the post-secondary educational opportunities available at SIPI.

231.    Tribal members have attended SIPI and returned to Isleta and utilized their educations to benefit the Pueblo.

232.    Due to the harms to student life, academics, student services, changes that imperil SIPI's accreditation, quality of education, and reputation, the Pueblo of Isleta's Department of Education will no longer recommend students to SIPI until the school has been stabilized.

233.    The inability to recommend SIPI to their students harms the Pueblo of Isleta's interests in the education and welfare of its citizens.

234.    If the Pueblo of Isleta had been extended the opportunity to consult on these significant changes at BIE and SIPI it would have opposed the devastating restructuring and impacts to academics and student services.

235.    In addition, if some reductions in force were unavoidable and there had been the opportunity to consult, Plaintiff Tribe Pueblo of Isleta would have consulted

on its preferences and priorities for which academic programs and services should be protected from such reductions.

## COUNT ONE

### Declaratory Judgment that Defendants Have Failed to Consult with Tribes as Required by 25 U.S.C. §§ 2003 and 2011

236.    All foregoing paragraphs are incorporated as if set forth fully herein.

237.    Defendants are required to consult with affected Tribes under 25 U.S.C. § 2003 before establishing new BIE policies or changing or modifying existing BIE policies.

238.    Defendants are required to consult with affected Tribes under 25 U.S.C. § 2011 before taking any action regarding Indian education under applicable laws as set forth in 25 U.S.C. § 2011.

239.    Defendants' BIE RIFs and restructuring constitute the establishment of new BIE policies or changing or modifying existing BIE policies.

240.    Defendants' BIE RIFs and restructuring constitute actions regarding Indian education under applicable laws as set forth in 25 U.S.C. § 2011.

241.    The BIE RIFs and restructuring were decisions made and actions taken by Defendants without consultation with affected Tribes under 25 U.S.C. §§ 2003 and 2011.

242.    25 U.S.C. §§ 2003 and 2011 guarantee the Tribal Nations the right of pre-decisional and pre-action consultation.

243.    Because of the failure to consult, the Tribal Nations have suffered the loss of their statutory consultation rights and have suffered other harms, including harms to their Tribes, their schools, their students and parents, and their education.

244.    The Tribal Nations are entitled to a declaratory judgment that the BIE RIFs and restructuring were decisions made and actions taken without consultation with affected Tribes in violation of 25 U.S.C. §§ 2003 and 2011(b).

## COUNT TWO

### Injunction Compelling Consultation with Tribes
### as Required by 25 U.S.C. §§ 2003 and 2011

245.    All foregoing paragraphs are incorporated as if set forth fully herein.

246.    Defendants' failure and continuing failure to consult with affected Tribes under 25 U.S.C. § 2003 before establishing new BIE policies or changing or modifying existing BIE policies, and under § 2011 before taking any action regarding Indian education under applicable laws as set forth in 25 U.S.C. § 2011, have caused and will continue to cause the Tribal Nations irreparable injury in terms of the loss of their statutory procedural rights and in terms of other harms to their Tribes, schools, students and parents, and education.

247.    The Tribal Nations are entitled to injunctive relief setting aside and voiding the BIE RIFs and restructuring of services implemented in violation of the tribal consultation requirements of 25 U.S.C. §§ 2003 and 2011.

248.    The Tribal Nations are entitled to injunctive relief requiring Defendants to cease making decisions and taking actions in violation of the consultation requirements of 25 U.S.C. §§ 2003 and 2011, including enjoining Defendants from implementing any further RIFs or developing ARRPs absent required Tribal consultation.

43

249.    The Tribal Nations are entitled to injunctive relief requiring Defendants to abide by their statutory obligations and consult with affected Tribes as required by 25 U.S.C. §§ 2003 and 2011(b).

## COUNT THREE

### Declaratory Judgment of Violation of APA – 5 U.S.C. § 706(2)(A)
### Agency Action Not in Accordance With Law
### (25 U.S.C. §§ 2003 and 2011)

250.    All foregoing Paragraphs are incorporated as if set forth fully herein.

251.    Defendants representing the BIE constitute an "agency" under the APA. 5 U.S.C. § 701(b)(1).

252.    The BIE RIFs and resultant restructuring constitute final agency action subject to review under the APA.

253.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

254.    Defendants are required to consult with affected Tribes under 25 U.S.C. § 2003 and agency regulations before establishing new BIE policies or changing or modifying existing BIE policies.

255.    Defendants are required to consult with affected Tribes under 25 U.S.C. § 2011 before taking any action regarding Indian education.

256.    Defendants' BIE RIFs and restructuring constitute the establishment of new BIE policies or changing or modifying existing BIE policies.

257.    Defendants' BIE RIFs and restructuring constitute actions regarding Indian education under applicable laws as set forth in 25 U.S.C. § 2011.

258.    The BIE RIFs and restructuring were decisions made and actions taken by Defendants without consultation with affected Tribes under 25 U.S.C. §§ 2003 and 2011 and governing policies.

259.    25 U.S.C. §§ 2003 and 2011 guarantee the Tribal Nations the right of pre-decisional and pre-action consultation.

260.    Because of the failure to consult, the Tribal Nations have suffered the loss of their statutory consultation rights and have suffered other harms, including harms to their Tribes, their schools, their students and parents, and their education.

261.    The Tribal Nations are entitled to a declaratory judgment that the BIE RIFs and restructuring were decisions made and actions taken without consultation with affected Tribes in violation of 25 U.S.C. §§ 2003 and 2011 and governing policies.

## COUNT FOUR

### Injunction Compelling Consultation with Tribes
### as Required by 25 U.S.C. §§ 2003 and 2011 and governing policies
### Under APA – 5 U.S.C. § 706(2)(A)
### Agency Action Not in Accordance With Law

262.    All foregoing paragraphs are incorporated as if set forth fully herein.

263.    Defendants' failure and continuing failure to consult with affected Tribes under 25 U.S.C. § 2003 before establishing new BIE policies or changing or modifying existing BIE policies, and under § 2011(b) before taking any action regarding Indian education under applicable laws as set forth in 25 U.S.C. § 2011, have caused and will continue to cause the Tribal Nations injury in terms of the loss

of their statutory procedural rights and in terms of other harms to their Tribes, schools, students and parents, and education.

264.    Pursuant to 5 U.S.C. § 706(2)(A), actions contrary to law should be voided and set-aside.

265.    The Tribal Nations are entitled to injunctive relief setting aside and voiding the BIE RIFs and restructuring of services implemented in violation of the Tribal consultation requirements of 25 U.S.C. §§ 2003 and 2011.

266.    The Tribal Nations are entitled to injunctive relief requiting Defendants to cease making decisions and taking actions in violation of the tribal consultation requirements of 25 U.S.C. §§ 2003 and 2011, including enjoining Defendants from implementing any further RIFs or developing ARRPs absent required tribal consultation.

267.    The Tribal Nations are entitled to injunctive relief requiring Defendants to abide by their statutory obligations and consult with affected Tribes as required by 25 U.S.C. §§ 2003 and 2011.

## COUNT FIVE

**Declaratory Judgement of Violation of APA – 5 U.S.C. § 706(2)(A)
Agency Action Not in Accordance With Law
(25 U.S.C. § 2003)**

268.    All foregoing paragraphs are incorporated as if set forth fully herein.

269.    Defendants representing the BIE constitute an "agency" under the APA. 5 U.S.C. § 701(b)(1).

270.    The BIE RIFs and restructuring constitute final agency action subject to review under the APA.

271.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

272.    25 U.S.C. § 2003 provides "[t]he provisions of part 32 of title 25, Code of Federal Regulations, as in effect on January 1, 1987, are incorporated into this Act and shall be treated as though such provisions are set forth in this subsection."

273.    The incorporated regulation 25 C.F.R. § 32.4(a)(3) mandates that "Indian Tribes and Alaska Native entities fully exercise self-determination and control in planning, priority-setting, development, management, operation, *staffing* and evaluation in all aspects of the education process" (emphasis added).

274.    The BIE RIFs and restructuring violated 25 C.F.R. § 32.4(a)(3).

275.    The incorporated regulation § 32.4(r)(2) "[e]xtend[s] to Tribes and Alaska Native entities the prerogative of determining those critical professions and fields of study in post-secondary education which are of the highest priority to meet their economic and cultural goals."

276.    The BIE RIFs violated § 32.4(r)(2).

277.    The  incorporated regulation 25 C.F.R. § 32.4(r)(1) "[e]nsure[s] to the extent possible that all students who choose to pursue career and post-secondary education, including but not limited to, undergraduate and graduate programs, or preparation for skilled trades, receive adequate academic or other preparation, at the schools of

their choice, assuring that students are provided adequate support services to enable them to meet their educational goals."

278.    The BIE RIFs and induced resignations violated §32.4(r)(1).

279.    The incorporated regulation 25 C.F.R. § 32.4(s)(2) requires that BIE "[m]aintain all school and residential facilities to meet appropriate Tribal, State or Federal safety, health and child care standards."

280.    The BIE RIFs and induced resignations violated § 32.4(s)(2).

281.    The incorporated regulation 25 C.F.R. § 32.4 (k)(1) requires that BIE "[s]erve as an advocate for Indian Tribes and Alaska Native entities in education matters before the Federal . . . government[]"

282.    The BIE RIFs and induced resignations were detrimental and contrary to their *Strategic Direction* and BIE failed to advocate for AI/AN Tribes before the federal government in violation of 25 C.F.R. §32.4(k)(1).

283.    Tribal Nations and Individual Students are entitled to a declaratory judgment that the BIE RIFs and restructuring violated 25 U.S.C. § 2003.

### COUNT SIX

**Injunction Compelling Consultation with Tribes as Required by 25 U.S.C. § 2003**
**APA – 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance With Law**

284.    All foregoing paragraphs are incorporated as if set forth fully herein.

285.    Defendants' failure and continuing failure to follow the regulations codified by 25 U.S.C. § 2003 have caused and will continue to cause the Tribal

Nations injury in terms of the loss of their statutory procedural rights and in terms of other harms to their Tribes, schools, students and parents, and education.

286.    Pursuant to 5 U.S.C. § 706(2)(A), actions contrary to law should be voided and set-aside.

287.    The Tribal Nations and Individual Students are entitled to injunctive relief setting aside and voiding the BIE RIFs and restructuring of services implemented in violation of 25 U.S.C. § 2003.

288.    The Tribal Nations and Individual Students are entitled to injunctive relief requiring Defendants to cease making decisions and taking actions in violation of 25 U.S.C. § 2003, including enjoining Defendants from implementing any further RIFs or developing ARRPs absent required tribal consultation.

289.    The Tribal Nations and Individual Students are entitled to injunctive relief compelling Defendants to abide by their statutory obligations required by 25 U.S.C. § 2003.

## COUNT SEVEN

**Declaratory Judgement of Violation of APA – 5 U.S.C. § 706(2)(A)**
**Agency Action That Is Arbitrary and Capricious and An Abuse of Discretion**

290.    All foregoing paragraphs are incorporated as if set forth fully herein.

291.    Defendants representing the BIE constitute an "agency" under the APA. 5 U.S.C. § 701(b)(1).

292.    The BIE RIFs and restructuring constitute final agency action subject to review under the APA.

293.    Under the APA, a court shall "hold unlawful and set aside agency action …

found to be[] . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A).

294.    The BIE RIFs were made largely without regard to the positions that the

employees occupied.

295.    The BIE RIFs fail to acknowledge the practical consequences that they will

produce, let alone provide a reasonable explanation why those consequences possibly

could be warranted. To say that the RIFs "entirely failed to consider an important

aspect of the problem," *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), where the RIFs did not even recognize the obvious

and immediate harm and disruption they will occasion is to dramatically understate

the extent to which the BIE RIFs are arbitrary and capricious.

296.    The BIE RIFs also fail to account for the substantial reliance interests that

Tribal Nations, students, families, and employees have in the BIE's Strategic

Direction, which all has been swept away. "When an agency changes course . . . it

must be cognizant that longstanding policies may have engendered serious reliance

interests that must be taken into account,'' and the failure to do so is arbitrary and

capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)

(internal quotation marks and citation omitted).

297.    Thus far, the BIE RIFs and induced resignations have occurred without

warning and without transition plans.

298.    Firing probationary employees without regard to the positions they hold, and without warning or ability to transition workload is contrary to GAO reports and recommendations and the BIE's own documents regarding BIE staffing needs. Indeed, additional resources likely will be needed to remedy the damage done by these sudden, unplanned departures. The BIE RIFs and restructuring were therefore arbitrary and capricious and should be set aside.

299.    Additionally, recruitment and retention of staff consistently has been identified as a challenge for BIE.  Eliminating probationary staff means the loss of employees that will be difficult to replace and will only serve to make recruitment harder, since the layoffs were executed without warning and without cause. Given these agency specific challenges, the BIE RIFs were arbitrary and capricious and should be set aside.

300.    The BIE RIFs were likewise arbitrary and capricious because they were based on an arbitrary percentage formula that had no rational relationship to the goal of reduced government spending and were not supported by an administrative record of reasoned decision making.

301.    Further, the firing of probationary employees included positions critical to BIE's operations and ability to fulfill GAO's recommendations and BIE's own *Strategic Direction*. For example, fiscal accountants, instructors, safety officers, and building inspectors were laid off, despite these positions being critical to BIEs progress. Abandoning their previous *Strategic Direction* and disregarding GAO's

recommendations are arbitrary and capricious actions and an abuse of discretion and should be set aside.

302.    Plaintiff Tribes are entitled to a declaratory judgment that the BIE RIFs and restructure were agency actions that were arbitrary and capricious and an abuse of discretion.

## COUNT EIGHT

**Injunction Compelling Defendants to Cease Violations of APA – 5 U.S.C. § 706(2)(A)**
**Agency Action That Is Arbitrary and Capricious and An Abuse of Discretion**

303.    All foregoing paragraphs are incorporated as if set forth fully herein.

304.    Defendants' arbitrary and capricious implementation of BIE RIFs have caused and will continue to cause the Tribal Nations irreparable injury in terms of harms to their Tribes, schools, students and parents, and education.

305.    Pursuant to 5 U.S.C. § 706(2)(A), arbitrary and capricious actions should be voided and set-aside.

306.    The Tribal Nations and Individual Students are entitled to injunctive relief setting aside and voiding the RIFs and restructuring.

307.    The Tribal Nations and Individual Students are entitled to injunctive relief compelling Defendants to cease making decisions and that are arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

a. Declare the BIE RIFs, induced resignations and restructuring made without the required tribal consultation to be in violation of 25 U.S.C. §§ 2003 and 2011 and otherwise contrary to law.

b. Issue an injunction barring Defendants and all of their officers, employees, and agents from taking any steps to direct, implement, or demand adherence to BIE RIFs implemented in February 2025.

c. Issue an injunction barring Defendants and all of their officers, employees, and agents from taking any steps to direct, implement, or demand additional RIFs, induced resignations and restructuring without prior consultation with American Indian/Alaska Native Tribes.

d. Issue an injunction compelling Defendants to conduct the required consultations with American Indian/Alaska Native Tribes.

e. Issue a declaration that this Court shall retain continuing jurisdiction to supervise and effectuate Defendants' adherence to and implementation and achievement of the relief granted.

f. Award Plaintiffs their costs of suit, including, without limitation, attorneys' fees, and other costs under applicable law and equity.

g. Grant such other relief as the Court deems necessary, just, and proper.

Dated: March 7, 2025.

/s/ Matthew Cambell
_____

Matthew Campbell
NM Bar No. 138207, CO No. 40808
mcampbell@narf.org

Jacqueline De León*
DC Bar No. 1023035, CA Bar No. 288192
jdeleon@narf.org
Allison A. Neswood*
CO Bar No. 49846
neswood@narf.org
Malia Gesuale*
CO Bar No. 59452
gesuale@narf.org

NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302

Samantha Blencke Kelty*
AZ Bar No. 024110, TX Bar No. 24085074
blencke@narf.org

NATIVE AMERICAN RIGHTS FUND
950 F Street, NW, Suite 1050,
Washington, DC 20004

*Motion for Pro Hac Vice forthcoming