**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PUEBLO OF ISLETA;<br><br>PRAIRIE BAND POTAWATOMI NATION;<br><br>CHEYENNE AND ARAPAHO TRIBES;<br><br>ELLA BOWEN;<br><br>KAIYA BROWN;<br><br>and DANIELLE LEDESMA;<br><br>*Plaintiffs*,<br><br>v.<br><br>SECRETARY OF INTERIOR, DOUG BURGUM;<br><br>UNITED STATED DEPARTMENT OF THE INTERIOR;<br><br>ASSISTANT SECRETARY – INDIAN AFFAIRS, WILLIAM KIRKLAND;<br><br>DIRECTOR, BUREAU OF INDIAN EDUCATION, TONY DEARMAN;<br><br>BUREAU OF INDIAN EDUCATION;<br><br>and UNITED STATES DEPARTMENT OF EDUCATION;<br><br>*Defendants*. | Case No. 1:25-cv-00696-AHA |

## COMPLAINT

Plaintiffs, three federally-recognized Tribal Nations ("Tribal Nations") and three impacted students ("Individual Students") file this action challenging two sets of agency actions taken without consulting with Tribal Nations: 1) the Department of the Interior's Bureau of Indian Education's ("BIE") reorganization/restructuring ("restructure") and reduction of staff at BIE's central and regional offices and the two BIE-operated post-secondary institutions, Haskell Indian Nations University ("Haskell"), and Southwest Indian Polytechnic Institute ("SIPI"); and 2) the execution and implementation of two interagency agreements, one between the Department of the Interior and the Department of Education and the other between the Department of Education and the Department of Labor, that transfer Indian educational programs from Education to Interior and Labor. These agency actions have harmed the educational experience offered to plaintiff students at Haskell and SIPI, imperiled Haskell's accreditation, degraded the ability of BIE institutions to retain faculty and students, imposed new bureaucratic hurdles, delayed critical funding, and imposed unnecessary costs on Plaintiffs. Defendants' restructuring of the Indian educational system is unlawful because it violates clear duties to consult prior to taking actions regarding Indian education. And Defendants' actions reducing an already overburdened workforce and adding additional layers of bureaucracy in a purported effort to reduce government bureaucracy were arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). Plaintiffs seek declaratory and injunctive relief.

## INTRODUCTION

1. The BIE is located within the U.S. Department of the Interior and pursuant to federal treaties, statutes, and the government-to-government and trust relationship between the United States and Tribes, operates and funds a federal education system. *See* BIE, *History*, https://www.bie.edu/topic-page/bureau-indian-education (last visited Aug. 20, 2026).

2. The BIE currently operates 55 elementary and secondary schools and provides funding for another 128 elementary and secondary schools operated by Tribes under contracts and grants that collectively serve about 40,000 students. *Id.* BIE also operates Haskell and SIPI, which respectively serve approximately 975 and 200–300 students.

3. BIE's well-documented and persistent inadequacies in operating its schools range from fiscal mismanagement to failure to provide adequate education to inhospitable facilities.

4. Many of the inadequacies at BIE schools are due to BIE understaffing.

5. Tribal Nations historically have faced great difficulties holding the BIE accountable for these inadequacies and for other critical aspects and components of education and services that BIE schools are supposed to provide.

6. To address BIE's inadequateness and lack of accountability, Congress enacted unequivocal tribal consultation laws. Consultation with tribes is required under these laws before action is taken regarding BIE and BIE schools. 25 U.S.C. § 2011(b)(1) ("All actions under this Act shall be done with active consultation with tribes."); 25 U.S.C. § 2003 (incorporating 25 C.F.R. § 32 (1987)); 25 C.F.R. § 32.4(a)(1) (1987) ("[N]o new policy shall be established nor any existing policy changed or modified without consultation with affected Tribes[.]").

7. Upon taking office on January 20, 2025, President Donald Trump issued a memorandum initiating a hiring freeze that halted hiring of vacant federal civilian positions. *Mem. of Jan. 20, 2025: Hiring Freeze*, 90 Fed. Reg. 8,247 (Jan. 28, 2025). On January 28, 2025, federal employees received notice of a Deferred Resignation Program, urging them to resign so their positions could be re-assigned or eliminated. Emily Davies et al., *White House incentivizes fed. workers to resign*, The Wash. Post (Jan. 28, 2025), https://www.washingtonpost.com/politics/2025/01/28/trump-emails-workforce/. And on February 11, 2025, President Trump called on Agency Heads to initiate large-scale reductions in force

("RIFs") and to develop Agency Reduction and Reorganizations Plans. Exec. Order No. 14,210, 90 Fed. Reg. 9,669 (Feb. 11, 2025) ("Executive Order 14,210"). Executive Order 14,210 called on the Office of Management and Budget ("OMB") to create a plan that required that "each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan." *Id.*

8. In February 2025, without consulting with Tribal Nations, BIE instituted RIFs and laid off employees throughout BIE central and regional offices, Haskell, and SIPI. These RIFs restructured the services offered throughout BIE operations.

9. Haskell and SIPI were immediately and severely impacted by these cuts. Instructors were laid off, student services were reduced or discontinued, and custodial and maintenance services were degraded throughout both campuses.

10. These cuts harmed Tribal Nations, schools, students, parents and families.

11. On February 26, 2025, OMB issued guidance on Executive Order 14,210 directing Agency Heads to prepare to initiate further large-scale RIFS and to develop Agency Reorganization Plans no later than March 13, 2025. Memorandum from OMB and Off. Of Personnel Mgmt. to Heads of Exec. Dep'ts and Agencies (Feb. 26, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

12. BIE RIFs and restructuring, including BIE's policy of hiring no more than one employee for each four employees that departed, were taken without consultation in violation 25 U.S.C. §§ 2003 and 2011, violated the rights of Tribal Nations and students, were arbitrary and capricious, and were an abuse of agency discretion.

13. On September 30, 2025, the Department of Education ("Education") executed Agreements with the Department of the Interior ("Interior") and the Department of Labor ("Labor") that move Education functions to Interior and Labor.

14. Education, Interior, and Labor executed the September 30 Agreements ("Interagency Agreements") without notifying or consulting Tribal Nations or, to Plaintiffs' knowledge, any other Tribal Nation.

15. Following execution of the Agreements, the Agencies held a single "consultation" concerning the Interagency Agreements' implementation on February 10, 2026. That meeting occurred after the Agreements had been executed, lacked any notification of planned or proposed Agency actions, and did not include proactive participation from Agency staff. The meeting fell far short of constituting tribal consultation, much less meeting Defendants' consultation duties.

16. On information and belief, the Department of Education started implementing the interagency agreement with the Department of Interior in June and July 2026 by detailing numerous employees from Education to Interior.

17. In mid-July, Plaintiffs requested that Education and Interior engage in consultation regarding this implementation and the detailing by Education to the Interior employees who are involved in administering Native American education programs. Interior refused consultation.

18. Tribal Nations seek declaratory and injunctive relief against the BIE RIFs, restructuring, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreements because those actions violated obligations and rights guaranteed by 25 U.S.C. §§ 2003 and 2011 and are arbitrary, capricious, and contrary to law.

19. The Tribal Nations and Individual Students seek a declaratory judgment that the BIE RIFs and restructuring were in violation of obligations and rights under 25 U.S.C. §§ 2003 and

2011, including Tribal rights to exercise control of priority-setting and staffing at BIE schools, Native students' rights to quality education, and rights to safe and secure school environments.

## PARTIES

*Tribal Plaintiff - Pueblo of Isleta*

20. Plaintiff Pueblo of Isleta is a federally recognized Tribal Nation. 91 Fed. Reg. 4104 (Jan. 30, 2026). The Pueblo of Isleta is in the Rio Grande valley just south of Albuquerque, New Mexico. Isleta is located less than an hour from SIPI and has had Tribal members attend both SIPI and Haskell. BIE also operates the Isleta Elementary School on the Isleta Pueblo.

*Tribal Plaintiff – Prairie Band Potawatomi Nation*

21. Plaintiff Prairie Band Potawatomi Nation ("Prairie Band") is a federally recognized Tribal Nation. 91 Fed. Reg. 4104 (Jan. 30, 2026). Prairie Band resides on a reservation in east-central Kansas, less than an hour's drive from Haskell. At least 23 enrolled Prairie Band members attended Haskell in Spring 2025, including Plaintiff Danielle Ledesma and former Plaintiff Victor Organista (who has graduated Haskell University). At least 13 enrolled Prairie Band members are scheduled to attend Haskell in Fall 2026.

*Tribal Plaintiff – Cheyenne and Arapaho Tribes*

22. Plaintiff Cheyenne and Arapaho Tribes is a federally recognized Tribal Nation located in western Oklahoma. 91 Fed. Reg. 4103 (Jan. 30, 2026). The Cheyenne and Arapaho Tribes offers post-secondary education scholarships to their member students, including students attending Haskell. As of Fall 2024, the Cheyenne and Arapaho Tribes had 35 tribal citizens enrolled at Haskell. As of Fall 2026, the Cheyenne and Arapaho Tribes have 18 tribal citizens enrolled at Haskell. Several Cheyenne and Arapaho students also attend the BIE operated Riverside Indian School in Anadarko, Oklahoma.

*Individual Student Plaintiffs*

23. Individual student Ella Bowen is an enrolled member of the Sault Ste. Marie Tribe of Chippewa Indians and is attending Haskell.

24. Individual student Kaiya Brown is an enrolled member of the Navajo Nation and is a student at SIPI.

25. Individual student Danielle Ledesma is an enrolled member of the Prairie Band Potawatomi Nation and is a rising senior at Haskell.

*Defendants*

26. Defendant Doug Burgum is the Secretary of the Interior, the agency head who oversees the Assistant Secretary - Indian Affairs.

27. Defendant United States Department of the Interior is an agency of the United States. It is headquartered in Washington, D.C.

28. Defendant Bureau of Indian Education is an administrative agency within the U.S. Department of the Interior, responsible for supporting educational opportunities for more than 400,000 American Indian and Alaska Native students across the United States through a direct services and funding programs.

29. Defendant William (Billy) Kirkland is the Assistant Secretary for Indian Affairs, who directly oversees and manages the BIE.[1]

30. Defendant Tony Dearman is the Director of the BIE, who is responsible for the direction and management of all education functions, including forming and implementing policies and procedures, supervising all program activities, overseeing schools, and approving the expenditure of funds appropriated for education functions.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Assistant Secretary – Indian Affairs Kirkland is substituted for Acting Assistant Secretary – Indian Affairs Bryan Mercier.

31. Defendant United States Department of Education is an agency of the United States. It is headquartered in Washington, D.C. Its Office of Indian Education administers the Indian Education Program of Elementary and Secondary Education Act and supports Local Education Agencies, Indian tribes and organizations, Alaska Native and Native Hawaiian grantees, post-secondary institutions and other entities in meeting the special educational and cultural related academic needs of American Indians, Alaska Natives and Native Hawaiians.

**JURISDICTION AND VENUE**

32. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1362. It is a civil action brought by federally recognized American Indian/Alaska Native Tribal Nations and it arises under federal law, including 25 U.S.C. §§ 2003 and 2011.

33. APA, 5 U.S.C. § 702, waives Defendants' sovereign immunity in this action for claims brought under the APA and non-APA statutes including 25 U.S.C. §§ 2003 and 2011.

34. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and its inherent authority to issue equitable relief. Injunctive relief is also authorized for claims under the APA. 5 U.S.C. §§ 705–706. A preliminary and permanent injunction may be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 65.

35. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because this is an action in which Defendants are officers and employees of the United States acting in official capacities and a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred within this judicial district.

## FACTUAL ALLEGATIONS

**Indian Education Inadequacies and BIE's Efforts to Improve**

36. The United States affirmatively recognizes and supports the sovereignty and Self-Determination of tribes. *See* Indian Self-Determination and Educ. Assistance Act of 1975, Pub. L. No. 93-638, 88 Stat. 2203 (1975). Congress also recognizes that:

> [T]he Federal Government has the sole responsibility for the operation and financial support of the Bureau of Indian Affairs funded school system that it has established on or near Indian reservations and Indian trust lands throughout the Nation for Indian children . . . [and a] unique and continuing trust relationship with and responsibility to the Indian people for the education of Indian children and for the operation and financial support of the Bureau of Indian Affairs-funded school system[.]

Pub. L. No. 95-561 (1978) (codified as amended at 25 U.S.C. § 2000, et seq.). This federal obligation entails "work[ing] in full cooperation with tribes." 25 U.S.C. § 2000.

37. 25 U.S.C. § 2000, *et seq*., codified the statutory framework governing the Bureau of Indian Affairs funded schools, and since 2006 the framework is implemented by the BIE. BIE, *History*, *supra*.

38. The 183 BIE operated and funded elementary and secondary schools are located on 64 Indian reservations in 23 states. *Id.* BIE also operates or funds off-reservation boarding schools like Riverside Indian School and dormitories near reservations for public school students. *Id.*

39. In addition to operating Haskell and SIPI, BIE also serves American Indian and Alaska Native post-secondary students nationwide through higher education scholarships and support funding for tribal colleges and universities. *Id.*

40. A litany of reports detail historic and persistent deficiencies in Indian education. *E.g.,* Alden Woods, *The Fed. Gov't Gives Native Students an Inadequate Educ., and Gets Away With It*, PROPUBLICA (Aug. 6, 2020), https://www.propublica.org/article/the-federal-government-gives-native-students-an-inadequate-education-and-gets-away-with-it; Indian Educ.: A Nat'l Tragedy –

A Nat'l Challenge, S. Rep. No. 91-501 (1969), *available at* https://narf.org/nill/resources/education/reports/kennedy/toc.html; Lewis Meriam, et. al., *The Problem of Indian Admin.* (1928), *available at* https://narf.org/nill/resources/meriam.html.

41. Between 2013 and 2025, the Government Accountability Office ("GAO") issued 24 reports and made 38 recommendations about the BIE and BIE schools. GAO, *GAO-25-108103, BIE: Greater Progress Needed to Address Remaining Challenges in Supporting and Overseeing Schools* 1 (2025), https://www.gao.gov/assets/gao-25-108103.pdf.

42. These and other reports identified extensive systemic problems within and with BIE. *See, e.g.*, GAO, *GAO-15-121, Indian Affairs: Bureau of Indian Educ. Needs to Improve Oversight of School Spending* (2014), https://www.gao.gov/assets/gao-15-121.pdf; GAO, *GAO-17-421, Indian Affairs: Further Actions Needed to Improve Oversight and Accountability for School Safety Inspections* (2017), https://www.gao.gov/assets/gao-17-421.pdf; GAO, *GAO-20-358, Indian Educ.: Actions Needed to Ensure Students with Disabilities Receive Special Educ. Services* (2020), https://www.gao.gov/assets/gao-20-358.pdf; Alden Woods, *The Fed. Gov't Gives Native Students an Inadequate Educ.*, *supra*.

43. Many GAO recommendations over the last decade focused on BIE's inadequate staffing.

44. In 2014, the GAO recommended the development of a strategic workforce plan to ensure that BIE has adequate staff with the requisite knowledge and skills to effectively oversee BIE school expenditures. GAO, *GAO-15-121, supra*, at 34.

45. In 2016, the GAO recommended BIE develop a plan to build the BIE's and BIE schools' capacity to promptly address safety and health problems with facilities. GAO, *GAO 16-313, Indian Affairs: Key Actions Needed to Ensure Safety and Health and Indian School Facilities* 28 (2016), https://www.gao.gov/assets/gao-16-313.pdf. In the same report, the GAO explained

that "Indian Affairs and school officials across several regions said that limited staff capacity, among other factors, impedes schools' ability to address safety deficiencies." *Id.* at GAO Highlights.

46. In 2020, the GAO recommended the BIE "update the agency's workforce plan to include a strategy and timeframe for filling vacant staff positions responsible for overseeing and supporting schools' special education programs." GAO, *GAO-20-358, supra*, at 29-30.

47. And, in 2024, the GAO recommended the BIE "update its strategic workforce plan to build its capacity to conduct all annual fiscal reviews . . . required by its policy." GAO, *GAO-24-105451, BIE: Improved Oversight of Schools' COVID-19 Spending is Needed* 24-25 (2024), https://www.gao.gov/assets/gao-24-105451.pdf.

48. Also, in June 2022 and April 2023 reports, the GAO called attention to vacancy rates at BIE of 33 percent and 27 percent respectively. GAO, *GAO-22-106104, High-Risk: Bureau of Indian Educ. Has Addressed Some Mgmt. Weaknesses, but Additional Work is Needed on Others* 9 (2022), https://www.gao.gov/assets/gao-22-106104.pdf; GAO, *GAO-23-106203, High-Risk: Efforts Made the Achieve Progress Need to Be Maintained and Expanded to Fully Address All Areas* 102 (2023), https://www.gao.gov/assets/gao-23-106203.pdf#page110.

49. In the June 2022 report, the GAO stated:

> [A]s of May 2022, BIE's overall staff vacancy rate is about 33 percent. This is the same vacancy rate we reported in our 2021 High-Risk Report. Furthermore, BIE's School Operations Division, which provides vital administrative support to schools, has a vacancy rate now of about 45 percent. We believe that high staff vacancy rates significantly inhibit BIE's capacity to support and oversee schools.

GAO, *GAO-22-106104, supra*, at 9.

50. As recently as February 12, 2025, the GAO issued an updated report and identified that progress has been made but cautioned that additional oversight and staffing is necessary to continue BIE progress. GAO, *GAO-25-108103,* 7.

51. The 2025 report explains that:

> Building staff capacity has been a challenge for BIE for over a decade. We have found that BIE's insufficient staff capacity has limited its ability to monitor schools' federal spending and assist schools with their special education programs. BIE has taken steps to address this issue . . . However, BIE's capacity issues have persisted. For example, in 2020 we found it did not have sufficient staff to monitor special education services at all schools to ensure students with disabilities receive these services as required by law. Also, in 2024 we found that BIE did not have sufficient staff to complete all required monitoring of schools it designated as at a high risk of financial mismanagement over the last year.

*Id*. at 10.

52. Reports have likewise recognized deficiencies in staffing at Haskell and SIPI. For example, House Report 105-700, titled "Haskell Indian Nations University and Southwestern Indian Polytechnic Institute Administrative Systems Act of 1998," identifies significant deficiencies at both institutions. This includes: lack of adequate staffing levels highlighting serious shortages in faculty and administrative personnel, which negatively impacted their ability to provide quality education and services; difficulty in hiring and retaining qualified staff noting both institutions struggle to attract and keep skilled educators and administrators, leading to gaps in instructional quality and institutional stability; and administrative challenges resulting in lack of sufficient personnel placing an additional burden on existing staff, leading to inefficiencies in academic and student support services. H.R. Rep. No. 105-700, pt. 1 (1998).

53. At a hearing held on July 23, 2024 testimony brought to light several staffing-related issues impacting the university's operations and student welfare. Key concerns included: leadership instability contributing to administrative instability at the institution; staffing shortages and resource limitations highlighting chronic understaffing and inadequate resources, which adversely affected the university's ability to support students effectively; and administrative oversight and support examining how administrative decisions and policies from the BIE may have impacted staffing and resources at the university. These staffing challenges were central to the

concerns raised during the hearing, reflecting broader issues within the institution's administration and its capacity to serve its student population effectively. *Investigating how the Biden Admin. Ignored Cries for Help from Students at Haskell Indian Nations Univ.: Hearing Before the Subcomm. on Oversight of the H. Comm. on Nat. Res.*, 118th Cong. (2024), https://www.youtube.com/watch?v=SHstjUJrPog.

54. The most recent BIE "Strategic Direction" in force prior to January 20, 2026 was the *2018–2023 Strategic Direction.* The BIE did not release its "Strategic Direction" plan for the years 2024 through 2030 until January 20, 2026. Bureau of Indian Affairs, *Press Release: Interior Unveils Bureau of Indian Education Strategic Direction to Drive Student Success and Cultural Strength* (Jan. 20, 2026), https://www.bia.gov/news/interior-unveils-bureau-indian-education-strategic-direction-drive-student-success-and.

55. The *2018–2023 Strategic Direction* describes the Bureau's goal to achieve an "employee system of support," which it defines as:

> A system that goes beyond evaluation to build a foundation of growth, continuous learning and supports to recruit, hire and retain high-quality staff with the capacity to carry out the organization's mission. . . . There are clear procedures for hiring, advancement and dismissal of employment.

BIE, *2018-2023 Strategic Direction* 33, 66 (Aug. 16, 2018), https://www.bie.edu/sites/default/files/documents/idc2-086443.pdf.

56. For the accomplishment of the BIE's goal of high academic standards in K-12 instruction, the *2018–2023 Strategic Direction* advances a strategy of "recruitment" of principals, teachers, and staff. *Id.* at 22.

57. And BIE set a "milestone" guideline for itself to measure its progress towards this strategy, asking whether the BIE "has reviewed, developed and/or revised guidance on how to effectively utilize federal funds to hire highly effective principals, teachers, and staff[.]" *Id.* at 42.

58. Similarly, BIE set a "strategy" of "leverage[ing] Haskell Indian Nations University and Southwestern Indian Polytechnic Institute as options for postsecondary education" to achieve its mission towards post-secondary and career readiness. *Id.* at 28.

59. To measure its own progress towards this strategy, BIE crafted milestones clearly aimed at increasing enrollment at Haskell and SIPI though purposeful, affirmative engagement with Tribes. *Id.* at 44.

60. BIE took steps to address these failings and staffing shortfalls. For example, for Fiscal Year 2025, Interior requested a $154.6 million budget increase, which included key funding for increased staffing. *Hearing on the 2025 President's Budget Request for Indian Affairs Programs Before the Subcomm. on Interior, Environ., and Related Agencies Comm. on Appropriations*, 118th Cong. 7 (2024) (statement of Bryan Newland Asst. Sec. - Interior) https://www.appropriations.senate.gov/imo/media/doc/download_testimony76.pdf.

61. BIE's *2024–2030 Strategic Direction*, currently in force, recognizes BIE's consultation duties. BIE, *2024–2030 Strategic Direction* 8 (Jan. 20, 2026), bie_strategic_direction_2024-2030_final_2.pdf. The Strategic Direction noted that BIE hosted "tribal consultations to hear from tribal leaders and other community members about the [Strategic Direction's] content," and that these "consultations were strategically located in different geographic regions throughout the country." *Id.* BIE noted that, following its nine consultation and listening sessions, it was "commended for soliciting widespread stakeholder participation, including students, to gather a wide range of perspectives and ensure the Strategic Direction aligns with the needs and values of the communities served." *Id.* at 9.

62. BIE 2024–2030 Strategic Direction consultations concluded in March 2024 and did not address BIE assuming any functions from the Department of Education. *Id.* at 11–12. BIE's consultation efforts "directly informed the content of the final 2024-2030 Strategic Direction." *Id.*

8. The *2024–2030 Strategic Direction* totaled 26 pages. The *2024–2030 Strategic Direction*'s two mentions of Haskell and SIPI provide no plan for those institutions. *Id.* at 6, 26.

63. BIE's *2024–2030 Strategic Direction* mentions the Department of Education once. *Id.* at 24. That reference related to the requirement that BIE funded schools administer assessments unless BIE and Education waive that requirement. *Id.*

**<u>Reorganization / Restructuring of Indian Education Workforce</u>**

64. Immediately upon taking office, President Trump's Administration issued a Presidential memorandum initiating a federal hiring freeze. *Mem. of Jan. 20, 2025: Hiring Freeze*, 90 Fed. Reg. 8,247 (Jan. 28, 2025)**.**

65. Without Tribal consultation, on January 28, 2025, the Office of Personnel Management ("OPM") offered federal workers the option to resign and be placed on paid administrative leave until September 30, 2025. Workers that resigned under this option were not required to fulfill their job responsibilities during their period of administrative leave. OPM, *Deferred Resignation Email to Fed. Emps.* (Jan. 28, 2025), https://www.opm.gov/fork/original-email-to-employees/; Davies et al., *White House incentivizes fed. workers to resign, supra*.

66. OPM stated that the reason the program was developed was because the "federal workforce is expected to undergo significant near-term changes. OPM, *Frequently Asked Questions,* OPM.GOV, https://www.opm.gov/fork/faq/.

67. On information and belief, BIE has not filled most of the positions vacated in Spring 2025.

68. On February 11, 2025, President Trump issued Executive Order 14,210 entitled *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative.* Exec. Order No. 14,210, 90 Fed. Reg. 9,669 (Feb 14, 2025). This Executive Order called for reforming the federal workforce and implementing "large-scale reductions in force (RIFs)[.]"

69. On or around February 13 and February 14, 2025, only one or two days after release of the February 12, 2025, GAO report that detailed how additional resources and staffing are needed to meet BIE's mission, BIE began letting go trial and probationary personnel at its central and regional offices and at Haskell and SIPI.

70. On February 26, 2025, OMB issued guidance on Executive Order 14,210 directing Agency Heads to undertake preparations to initiate further large-scale RIFS and to develop Agency RIF and Reorganization Plans ("ARRP"). OMB, *Guidance on Agency RIF and Reorganization Plans Requested by* Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative (Feb. 26, 2025), *supra*.

71. OMB's February 26 guidance explained that agencies should "[c]ontinu[e] to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart." *Id.*

72. On March 4, 2025, OPM issued another memo entitled "Guidance on Probation Periods, Administrative Leave and Details" clarifying that with regard to probationary employees "[a]gencies have ultimate decision-making authority over, and responsibility for, such personnel actions." OPM, *Guidance on Probationary Periods, Admin. Leave and Details* 2 (March 4, 2025), https://www.opm.gov/media/yh3bv2fs/guidance-on-probationary-periods-administrative-leave-and-details-1-20-2025-final.pdf.

73. The abrupt removal of staff subject to the RIF from their duties violated the agencies' duty to, when possible, "retain the employee[s] on active duty status" following the issuance of the notice of termination. 5 C.F.R. § 351.806. The RIF also resulted in the termination of knowledgeable employees, thus undermining continued effective government operations.

74. Interior completed its ARRP on March 13, 2025.

75. In January 2026, GAO assessed "Indian Affairs' actions to downsize its workforce" based on data from January 20, 2025 through July 31, 2025. GAO, *GAO-26-108673, Indian Affairs: Info. on 2025 Workforce Reductions* (2026), https://www.gao.gov/products/gao-26-108673.

76. Prior to the 2025 workforce reduction and restructuring, Interior suffered from "workforce capacity" challenges and "Indian Affairs officials said that the additional workload and competing priorities strained the agency's already limited workforce capacity." *Id.* at 5–6.

77. Between January 25 and July 12, 2025, BIE reduced its workforce by at least 151 employees. *Id.* at 24. BIE eliminated 9 percent of staff in its "School Operations Division—which includes acquisition, grants management, safety and facilities-related issues." *Id.* at 13, 24.

78. The workforce reduction and restructuring reduced BIE's ability to provide educational services, exacerbating "preexisting workforce capacity limitations." *Id.* at 16-17. Interior officials stated that the workforce reduction efforts "resulted in a loss of experienced staff." *Id.* at 15. Such staff possess vital institutional knowledge, leadership, and expertise. BIE's service times, including the time it takes to respond to grant issues, increased. *See id.* at 15.

79. GAO's workforce reduction report recognized that "[e]xecutive directives and Interior policies require agencies to consult with federally recognized Tribes on federal policies that have tribal implications." *Id.* at 4. GAO acknowledged that:

> [T]ribal consultation is a formal, two-way, government-to-government dialogue between official representatives of Tribes and federal agencies to discuss federal proposals before the federal agency makes decisions on those proposals.

and that Interior must provide sufficient notice" prior to consultation and "explain to tribal leaders how the final agency decision incorporates tribal input." *Id.* at 5.

80. Interior officials did not analyze "any projected future cost savings from these staff reductions or the impacts of the staff reductions." *Id.* at 15.

81. On information and belief, BIE has failed to replace, or even attempt to replace, the vast majority of its employees who departed due to the 2025 workforce reduction and restructuring.

82. Since July 2025, Interior prepared for additional workforce reductions. Natalie Alms, et al., *The Interior Dep't is taking steps to implement layoffs* (Sept. 24, 2025) https://www.govexec.com/workforce/2025/09/interior-department-taking-steps-implement-layoffs/408342/. Interior also pushed its employees to "accept voluntary incentives to leave their jobs or retire early, ahead of a long-awaited department reorganization" and consolidated support functions, leaving remaining employees with additional work. Jory Heckman, *Interior Dept gives employees third shot at voluntary incentives to leave their jobs* (Apr. 2, 2026) https://federalnewsnetwork.com/reorganization/2026/04/interior-dept-gives-employees-third-shot-at-voluntary-incentives-to-leave-their-jobs/.

83. BIE's RIFs left fewer employees with more work, causing additional employees to leave. Staffing needs at BIE, and the problems caused by understaffing, have thus increased since July 2025 (the cutoff date for the data GAO considered).

84. These cuts to BIE staff interfere with BIE's ability to carry out its statutorily required functions. This harms students, parents, teachers, schools, Tribal Nations and Tribal members. BIE's staff are integral to ensuring that it functions and provides Congressionally-required educational services to Tribes.

**Failure to Consult Regarding the Workforce Reduction and Restructuring**

85. DOI has several policies to ensure compliance with 25 U.S.C. §§ 2011 and 2003 Tribal consultation requirements.

86. Defendant Kirkland and his predecessor, Bryan Mercier, are responsible for ensuring that BIE follows its consultation policy. Bureau of Indian Affs., *Indian Affs. Manual* pt. 18 ch. 6 § 1.5 (A)(1) (Dec. 26, 2024) ("Regul. Affs. and Collaborative Action: Tribal Consultation Process"), https://www.bia.gov/sites/default/files/dup/assets/public/raca/manual/pdf/18_iam_6_tribal_consultation_process_final_12.19.24_eoreferenceremoved_signed_508.pdf.

87. Defendant Dearman is responsible for "ensuring consultation occurs early in the process (i.e., as soon as realistically possible once [Indian Affairs] identifies a project, approach, or regulation that may potentially impact Tribal lands, people, programs, or rights)." *Id.* § 1.5 (B)(4).

88. DOI's policy requires it to "consult with tribes on a government-to-government basis whenever DOI plans or actions have tribal implications" and further mandates that "[a]ll bureaus and offices shall comply with and participate in the consultation process in a manner that demonstrates a meaningful commitment and ensures continuity in the process." Interior, *DOI Policy on Consultation with Indian Tribes and Alaska Native Corps.,* pt. 512 ch. 4 (Nov. 9, 2015), https://www.doi.gov/sites/doi.gov/files/512-dm-4-department-of-the-interior-policy-on-consultation-with-indian-tribes.pdf.

89. Indian Affairs' policy is:

> [T]o facilitate meaningful consultation with Tribes in order to: ensure Tribal impacts and concerns are heard and respected as part of IA's commitment to honoring its nation-to-nation relationship with Tribes; acknowledge the United States' treaty and trust responsibilities to Tribal Nations; and facilitate compliance with all applicable laws and regulations as well as with Department of the Interior ("DOI") policies and procedures regarding Tribal consultation.

Bureau of Indian Affs., *Indian Affairs Manual* pt. 18. ch. 6 § 1.3, *supra*.

90. Interior Defendants did not engage in consultation with Tribal Nations prior to the February 2025 RIFs.

91. Interior Defendants did not engage in consultation with Tribal Nations prior to firing BIE probationary employees.

92. Interior Defendants did not engage in consultation with Tribal Nations prior to completing any ARRP.

93. Interior Defendants did not engage in consultation with Tribal Nations prior to the February 2025 RIFs.

94. If Tribal Nations, including Plaintiff Tribal Nations, had been offered an opportunity to consult on the BIE RIFs, restructuring, or the ARRPs, they would have taken it.

**Post Workforce Reduction Listening Sessions**

95. BIE did not make any effort to engage in consultation regarding its workforce reduction until April 16, 2025. Letter from Pueblo of Isleta Governor Jiron, Prairie Band Potawatomi Nation Chairman Rupnick, and Cheyenne and Arapaho Tribes Lt. Governor Hershel Gorham to O. Whaley, Interior 1–2 (July 7, 2025), *available at* https://narf.org/nill/documents/20260312-bie-isleta-potawatomi-cheyenne-arapaho-comments.pdf.

96. Tribal Nations provided oral and written comments in response to BIE's April 16, 2025 invitation. *Id.*

97. Consultation to discuss the consequences of decisions that already have been made and actions that already have been taken does not constitute meaningful tribal consultation consistent with legal requirements. *Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1058–59 (D.S.D. 2016).

98. BIE's post-hoc "consultation" process was also deficient for numerous other reasons. Letter from Pueblo of Isleta Governor Jiron, Prairie Band Potawatomi Nation Chairman Rupnick, and Cheyenne and Arapaho Tribes Lt. Governor Hershel Gorham to O. Whaley, Interior 1–2 (July

7, 2025), https://narf.org/nill/documents/20260312-bie-isleta-potawatomi-cheyenne-arapaho-comments.pdf. The "consultation" confusingly combined workforce reduction and energy permitting issues, was unstructured and lacking in agency engagement, and failed to provide critical information about the policy proposals under consideration. *Id.*

99. The "consultation" was confusing and contradictory, including because it arbitrarily eliminated any discussion of staffing increases or how BIE might effectuate RIFs without diminishing services and support to Tribal Nations. *Id.* at 4–5.

100. BIE did not engage in meaningful consultation regarding the many ways in which reducing BIE's workforce diminished and would diminish operational support to Tribal Nations and the quality of education and the educational support and opportunities offered to Tribal students. *Id.* at 5–9. BIE also did not meaningfully consult regarding the fact that, consistent with GAO reports, hiring more staff would lead to better and more efficient use of BIE funds and the fulfilment of its legal responsibilities, including its trust and treaty responsibilities. *Id.*

**BIE Workforce Reduction and Restructuring at BIE Central and Regional Offices**

101. Between the evenings of February 13, and February 14, 2025, BIE leadership and staff notified approximately 22 BIE employees that their positions were terminated.

102. These employees were given a few hours to pack their belongings and vacate the premises. They were not provided with an opportunity to finish or transition their workloads.

103. Approximately 5 of these staff members were in the central BIE office. The remaining approximately 17 employees were in regional roles.

104. Positions eliminated included school safety specialists, fiscal auditors, financial analysts, accountants, human resource officers, management analysts, and IT personnel, among others.

105. The laid off employees were not let go based on their performance of their duties.

106. The loss of staff required BIE to forgo or reassign work to other staff.

107. This abandonment of services and reassignment of tasks restructured BIE.

108. Given the numerous GAO reports that have recommended additional BIE oversight and staffing, in particular in the fields of the laid off employees such as safety specialists and fiscal auditors, these losses set back BIE's progress.

**BIE Workforce Reduction and Restructuring at BIE Schools**

109. Among BIE's operated schools is Isleta Elementary School, which is located on Plaintiff Pueblo of Isleta's reservation.

110. The Pueblo of Isleta's Department of Education coordinates with BIE to provide culturally sensitive curriculum and language education to the tribal children who attend the school.

111. Many of Isleta Elementary School's staff are Isleta Tribal members.

112. Isleta Elementary School, like many other BIE schools, has traditionally struggled to maintain sufficient staffing.

113. If Isleta Elementary School is closed or its ability to educate its current students reduced, students would be forced to attend schools away from the Pueblo. The long transit times to schools outside of the Pueblo impose burdens on the Pueblos' coordination of after school programs, the Pueblos' member students, and the students' parents, some of whom are Pueblo employees.

114. Parents of current students expressed concerns about the lack of services and staffing inconsistency at Isleta Elementary School and indicated that they planned to enroll their children in a neighboring school because of these concerns.

115. Isleta's Head Start program promoted 26 children after the 2025–26 school year. As of promotion at the end of the 2025–26 school year, only 6 of the children indicated that they planned to attend Isleta Elementary School.

116. Isleta Elementary School's kindergarten enrollment numbers for the 2025–26 and 2026–27 school years are substantially below the school's average enrollment for the past ten years.

**BIE Workforce Reduction and Restructuring at Haskell**

117. The BIE operates Haskell in "partial[] fulfillment of the trust responsibility between the United States and Indian Country." Haskell, *Haskell History*, https://haskell.edu/about/history/ (last visited Aug. 21, 2026).

118. Haskell's mission is to "build the leadership capacity of our students by serving as the leading institution of academic excellence, cultural and intellectual prominence, and holistic education that addresses the needs of Indigenous communities." Haskell, *Mission Statement*, https://haskell.edu/about/vision/ (last visited Aug. 21, 2026).

119. Haskell offers associate degree programs in Communications Studies, Liberal Arts, Media Communication, Para Professional Education, Social Work, Community Health, Health, Sports and Exercise Science, Natural Sciences, and Recreation Fitness Management. Haskell offers Baccalaureate Degree Programs in Business Administration, Environmental Studies, Elementary Education, and Indigenous Arts and American Indian Studies. Haskell, *Assoc. Degree Programs*, https://haskell.edu/academics/associate-degree-programs/ (last visited Aug. 21, 2026).

120. Haskell hosts cultural and academic events such as Haskell's Indian Art Market, Stories-n-Motion Film Festival, and the Haskell Commencement and Pow-wow.

121. According to GAO, Haskell had approximately 179 total staff on January 25, 2025. As of 2025, Haskell served approximately 975 Native American and Alaska Native students per year.

122. Between the evenings of February 13 and February 14, 2025, BIE leadership and staff notified approximately 37 Haskell employees that their positions were terminated.

123. These employees were given a few hours to pack their belongings and vacate the premises. They were not provided with an opportunity to finish or transition their workloads.

124. These staff members provided essential services to the Haskell student body.

125. Fourteen of the eliminated positions were student facing, including seven instructors. This resulted in 34 academic courses losing an instructor.

126. Twelve of the eliminated positions performed administrative tasks and 11 performed operational duties.

127. Terminated positions included the Dean of Students, instructors, property management specialists, coaches, tutors, residential advisors, academic advisors, custodians, and food services employees, among others.

128. An additional 11 staff from Haskell were induced to resign.

129. In February 2025, Haskell lost over a quarter of its staff.

130. The laid off employees were not let go based on performance of duties.

131. Haskell is accredited by the Higher Learning Commission ("HLC"), which sets specific standards for accreditation to ensure that institutions of higher education meet academic and operational requirements. *See* 25 U.S.C. § 2001. These standards cover multiple areas, such as mission and integrity, student learning and resources, and institutional effectiveness.

132. Personnel reductions imperil Haskell's accreditation by reducing Haskell's ability to provide quality education, meet student needs, or maintain operational effectiveness. Higher Learning Comm'n, *Current Criteria for Accreditation* (2020), https://www.hlcommission.org/accreditation/policies/criteria/?highlight=Current+Criteria+for+Accreditation (last visited Aug. 21, 2026).

133. On July 8, 2025, the Higher Learning Commission placed Haskell on Notice that "it is at risk of being out of compliance with the Criteria for Accreditation." Letter from M. Moore,

Haskell Interim President (July 8, 2025), https://haskell.edu/wp-content/uploads/2025/08/HLC-Action-Letter-Haskell-Indian-Nations-University-7.8.25.pdf (last visited on Aug. 21, 2026). The letter requires Haskell to address six issues by December 2026. *Id.*

134. Haskell's ability to address the Higher Learning Commission's accreditation letter was compromised by BIE's reduction of Haskell's workforce.

135. Considering all BIE staffing changes between January 25 and July 12, 2025, BIE eliminated at least 11 percent of Haskell's staff. GAO, *GAO-26-108673, supra*.

136. Haskell's staffing levels have continued to fall since July 2025. According to OPM's Enterprise Human Resources Integration system, Haskell's staffing level in June 2026 was at least 15 percent lower than it was prior to BIE's workforce reduction and restructuring efforts.

137. BIE's reduction and restructuring of Haskell's workforce caused services provided to Haskell students to be modified, curtailed, or eliminated.

138. BIE's reduction and restructuring of Haskell's workforce has harmed and continues to harm Haskell's ability to continue providing educational services to Tribes and Tribal members, and jeopardized Haskell's ability to continue as an accredited educational institution.

**<u>Defendants' effort to transfer the responsibilities of the Department of Education</u>**

139. On March 3, 2025, Defendant McMahon was confirmed as Secretary of Education. Since that date, she has taken numerous steps to eliminate Education.

140. On September 30, 2025, Education signed an Interagency Agreement with Interior that explicitly governs Indian Education ("Interior Agreement").[2] Interior thus committed to carry out thirty-three "activities in coordination with and subject to the supervision" of Education.[3]

---

[2] Interagency Agreement Between Education and Interior Relating to the Office of Indian Education, https://www.ed.gov/media/document/ed-and-doi-interagency-agreement-indian-education-partnership-september-30-2025-and-january-9-2026-addendum-113021.pdf.

[3] *Id.* at 2, § 3(A).

Education committed to carry out an additional eighteen activities.[4] And Education and Interior committed to "develop an expedited path for executing" forms for transferring funds from Education to Interior.[5] Neither Education nor Interior engaged in tribal consultation before executing the Interior Agreement.

141. On September 30, 2025, Education signed an Interagency Agreement with Labor ("Labor Agreement").[6] The Labor Agreement "establish[ed] a partnership" between Education and Labor.[7] The Labor Employment and Training Administration "commit[ted] to carry out [forty-two] activities in coordination with and subject to" Education's supervision.[8] Education committed to carry out an additional seventeen activities.[9]

142. On January 9, 2026, Education and Interior executed an addendum to their Interagency Agreement.[10] Neither Education nor Interior engaged in tribal consultation before amending the Interior Agreement.

143. The Interagency Agreements move program functions affecting Tribes and Tribal members from Education to Interior and Labor. The Interagency Agreements retain statutorily-required Department of Education oversight over those programs, thus adding an additional layer of bureaucracy and complexity to Education decisionmaking. *See* 20 U.S.C. 3423c (Creating Office of Indian Education in the Department of Education "under the direction of the Director . . . who shall report directly to the Assistant Secretary for Elementary and Secondary Education).

---

[4] *Id*. at 6-7, § 3(B).
[5] *Id*. at 8, § 4.
[6] Interagency Agreement Between Education and Labor Relating to the Office of Elementary and Secondary Educ. (OESE), https://www.ed.gov/media/document/ed-and-dol-interagency-agreement-elementary-and-secondary-education-partnership-updated-050126-113000.pdf.
[7] *Id*. at 1, § 1.
[8] *Id*. at 2-8, § 3(A).
[9] *Id*. at 8-9, § 3(B).
[10] *Id.* at 12.

144. The Interagency Agreements place new program responsibilities in Labor and Interior despite those agencies lacking expertise in these programs or necessary resources.

145. The Interagency Agreements place new program responsibilities in Interior despite multiple GAO reports on Interior's systemic problems and inadequate staffing.

146. Secretary McMahon described the Interagency Agreements as a "bold action to break up the federal education bureaucracy" and a step towards sending education "back to the states."[11] Shortly after entering the Interagency Agreements, Secretary McMahon issued RIF notices to hundreds of education personnel on October 10, 2025.[12] Secretary McMahon confirmed that Education's rationale for the new RIF was to dismantle the Department of Education because it is "unnecessary."[13]

147. The agencies noted that these moves are in accordance with Executive Order No. 14,242, which seeks to close Education. And on November 17, 2025, the President put out a statement that the Interagency Agreements "returned control of education to . . . States, local communities, and parents" by "dismantling the Department of Education."[14]

148. Neither Education nor Interior engaged in consultation with Plaintiff Tribal Nations (or any other Tribes) before signing or amending the Interior Agreement.

---

[11] Education, *Press Release: U.S. Dep't of Educ. Announces Six New Agency P'ships to Break Up Fed. Bureaucracy* (Nov. 18, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-announces-six-new-agency-partnerships-break-federal-bureaucracy. *See e.g.* Secretary Linda McMahon (@EDSecMcMahon), X (Nov. 20, 2025, 2:15PM), https://perma.cc/C6MW-SES9.

[12] Mark Lieberman, *Education Department Lqyqffe Would Affect Dozens if Programs. See Which Ones,* Education Week (Oct. 16, 2025), *available at* https://perma.cc/5LN8-8EZZ.

[13] Secretary Linda McMahon (@EDSecMcMahon), X (Oct. 15, 2025, 1:01PM), *available at* https://perma.cc/32E9-BA8Y.

[14] The White House, *Presidential Message on American Educ. Week* (Nov. 17, 2025), *available at* https://perma.cc/TCR3-N4X5.

149. Neither Education nor Labor engaged in consultation with Tribal Nations (or any other Tribes) before signing or amending the Labor Agreement.

**Post Interagency Agreement Listening Session**

150. Interior, Education, and Labor invited Tribal leaders to a single "consultation" session after executing the Interagency Agreements. Consultation on Interagency Partnerships between the U.S. Dept's of Education, Interior, and Labor (Jan. 9, 20226), https://www.ed.gov/media/document/letter-tribal-leaders-january-9-2026-consultation-interagency-partnerships-between-united-states-departments-of-education-interior-and-labor-january-9-2026.pdf.

151. As the Notice for the February 10, 2026 meeting states, the Interagency Agreements raised significant issues including safeguarding "the rights of Native families," "continuity and stability of funding, services, and support to Tribal communities," the possibility of "creating additional layers of Federal bureaucracy in administering Tribal education programs." *Id.* at 2, 4.

152. The "consultation" meeting was held on February 10, 2026, 133 days after the Agencies executed the Interagency Agreements on September 30, 2025. The single "consultation" meeting thus occurred far too late to constitute legally adequate consultation regarding the Agencies' decisions to enter Interagency Agreements in September 2025.

153. The post-hoc "consultation" notice, and subsequent meeting, were deficient for numerous other reasons. The notice did not provide adequate information to support consultation. It identified several vague purposes relating to the Interagency agreements but identified no specific proposals to inform consultation. The single meeting did not provide an opportunity for Tribal leaders, including Plaintiff Pueblo of Isleta's Governor and Lieutenant Governor, to attend. The single meeting was unstructured. It included no dialogue. It provided no opportunity for Tribal leaders to ask questions and receive responses. Agency decisionmakers appeared to deliver closing

remarks at the end of the session and did not carry out any consultation. Letter from Pueblo of Isleta Governor Jiron, Prairie Band Potawatomi Nation Chairman Rupnick, and Cheyenne and Arapaho Tribes Lt. Governor Hershel Gorham to L. McMahon 1–6 (Mar. 12, 2026), *available at* https://narf.org/nill/documents/20260312-bie-isleta-potawatomi-cheyenne-arapaho-comments.pdf.

154. Interior and Education did not engage in meaningful consultation regarding numerous issues, including, Tribal Nations' concerns regarding: 1) the extent to which the Interagency Agreements might compound harms caused by BIE's workforce reduction; 2) how the Interagency Agreements could undermine the stability of programs and staff; 3) how transferring functions would delay funding disbursements; 4) that the Interagency Agreements fail to reduce bureaucracy and instead create additional layers of bureaucracy; 5) that vague references to oversight mechanisms and performance measures risk increasing burdens on already overburdened staff. *Id.* at 7–13.

155. Tribal Nations' written comments posed questions to Interior and Education regarding the Interagency Agreements. Neither Interior nor Education answered any of the questions.

156. The post-hoc "consultation" did not comply with Interior's Tribal consultation policy. 512 DM §§ 4.4, 5.4; Bureau of Indian Affairs Tribal Consultation Policy, *available at* https://perma.cc/4HFD-SZZB; § 4.4 https://perma.cc/B6LP-38N4; § 5.4 https://perma.cc/VGZ8-UFEZ.

157. The post-hoc "consultation" did not comply with Education's Tribal consultation policy. Educ. Tribal Consultation Policy, https://www.ed.gov/media/document/tribalpolicyfinalpdf-35325.pdf (last visited Aug. 24, 2026).

158. Education, Interior, and Labor issued a "Tribal Consultation Summary Report" in June 2026. The report fails to address, much less engage with, many of Tribal Nation's comments.

**IMPLEMENTATION OF AGENCY AGREEMENTS WITHOUT CONSULTATION**

159. On June 12, 2026, Counsel for Federal Defendants informed Counsel for Plaintiffs that Education and Interior recently implemented the Interagency Agreements by Education detailing several employees, part-time, to Interior. Counsel for Defendants further stated that Education and Interior expected to enter an agreement to detail an additional fourteen employees full-time to from Education to Interior in mid-June.

160. On information and belief, the detailing of fourteen employees would constitute the transfer of the entirety of the Department of Education Office of Indian Education ("OIE") staff, except for the statutorily mandated Executive Director.

161. The wholesale transfer of the Education staff is consistent with the Trump administration's stated desire to eliminate Education.

162. Counsel for Plaintiffs objected to Education and Interior detailing almost every employee of Education's Office of Indian Education to Interior and requested that Education and Interior engage in consultation regarding detailing Education employees to Interior.

163. Counsel for Defendants stated that Interior does not consult about internal personnel matters.

164. Defendants generally expect some portion of their workforce to quit rather than relocate. *See* Federal News Network, *USDA expects 'significant number' of staff facing relocation to leave their jobs*, https://federalnewsnetwork.com/workforce/2026/07/usda-expects-significant-number-of-staff-facing-relocation-to-leave-their-jobs/ (last visited Aug. 24, 2026).

165. Restructuring the Indian educational system is not an internal personnel matter.

166. Neither Interior nor Education held any consultation regarding the Interagency Agreements, including the relocation of nearly the entirety of the OIE's employees to Interior, between February 10, 2026 and August 26, 2026.

167. In August 2026, Interior and Education provided notice of a "consultation" session on August 27, 2026 regarding Fiscal Year 2027 Grantmaking Priorities and a "consultation" session on August 27, 2026 regarding Fiscal Year 2028 Budget Priorities. These notice emails provide no information, as agency proposals, that would inform meaningful dialogue. They instead pose questions, apparently continuing the agencies' practice of engaging in listening sessions rather than dialogue.

**Harms to Student Life, Academics, Student Services, and Tribal Interests from workforce reduction and restructuring at Haskell**

168. On the day of the BIE RIFs, Haskell's student newspaper reported:

> For [Haskell] students, the effects are immediately visible. Several courses are now left without their original instructors, putting students' educational experience in jeopardy. While some faculty members are being asked to take on additional classes to cover the vacancies, this has put an immense strain on the remaining staff. Teachers are now burdened with larger workloads, and the quality of education is at risk as educators juggle responsibilities beyond their capacity.

Tara Roanhorse, *Haskell Indian Nations Univ. Faces Major Staffing Cuts, Students Left Without Teachers*, THE INDIAN LEADER (Feb. 14, 2025), https://theindianleader.com/2025/02/14/haskell-indian-nations-university-faces-major-staffing-cuts-students-left-without-teachers/.

169. Reaction to the Haskell staff firings was swift, with students, alumni, leadership, and Tribal communities condemning the BIE RIFs and expressing shock, dismay, and worry. Haskell Faculty Senate (public statement), *Haskell Faculty: Trail of broken treaties continues with mass terminations at tribal college*, INDIANZ.COM (Feb. 21, 2025), https://indianz.com/News/2025/02/21/haskell-faculty-trail-of-broken-treaties-continues-with-mass-terminations-at-tribal-college/; Jourdan Bennett-Begaye and Kevin Abourezk, *'Devastated and heartbroken': Fed. layoffs have Haskell, SIPI wrestling with their future*, INDIAN COUNTRY TODAY (Feb 18, 2025), https://ictnews.org/news/devastated-and-heartbroken-federal-layoffs-could-force-haskell-sipi-to-close.

170. The students' Welcome Back Powwow, which was scheduled for February 22, 2025, was cancelled due to the layoffs. The powwow is:

> [A]n essential tradition for [Haskell] students. For many students, this powwow is more than just a social gathering; it's an important reminder of their identity and the cultural support they need while navigating the challenges of college life.

Tara Roanhorse, *Haskell Indian Nations Univ. Faces Major Staffing Cuts, Students Left Without Teachers*, *supra*.

171. Haskell intramural volleyball, basketball, and softball leagues were cancelled from Spring 2025 through Spring 2026 because of staff reductions.

172. Likewise, the Haskell Student Success Center was shuttered for much of 2025. The Student Success Center's mission is to provide centralized, accessible, and enriched academic services and programs to support and enhance the academic, cultural and career success of Haskell Students. It offers services such as workshops on time management, study skills and test taking skills, and it serves as a place to answer student questions. It houses mental health coaching staff, who provide resources and support to struggling students. It also assists students in applying for and maintaining access to financial aid.

173. Haskell students' financial aid was delayed, imposing mental and financial costs on those students.

174. Haskell's financial aid office remains short-staffed, with fewer employees to assist students than it had in January 2025.

175. Plaintiff Ella Bowen is a sophomore at Haskell. Prior to February 2025, her financial aid was disbursed in a timely manner. She has observed that Haskell's financial aid office is short staffed since February 2025. Since February 2025, her financial aid disbursements have been delayed by months. This delay in financial aid disbursements has caused Ms. Bowen to worry about money for laundry and food.

176. Ms. Bowen's academic advisor was fired. The loss of academic advisors caused the remaining advisors to be overburdened and confusion among students.

177. Plaintiff Danielle Ledesma also had her financial aid delayed in 2025. This delay caused significant stress and hardship to Ms. Ledesma.

178. In spring, 2026, Ms. Ledesma was threatened with the loss of her tribal scholarship due to continued problems with Haskell's financial aid office. The office failed to process forms that were necessary for Ms. Ledesma to continue receiving a tribal scholarship. This threat caused significant Ms. Ledesma significant stress required substantial additional work to obtain the necessary form.

179. Prairie Band Potawatomi Nation member Victor Organista graduated from Haskell in May 2026 with an associates degree in Media Communications.

180. In Spring 2025, Mr. Organista's financial aid was delayed. The delay forced him to rely on his mother, who is also a member of the Prairie Band Potawatomi Nation, thereby placing financial strain on his mother. He did not receive his financial aid until the middle of the Fall 2025 and Spring 2026 semesters, creating similar financial burdens. He observed that Haskell's financial aid office is consistently understaffed.

181. Mr. Organista is now enrolled at Washburn University. He already received his financial aid for the Fall 2026 semester.

182. All but three members of the custodial staff at Haskell were laid off, resulting in less clean buildings and posing a health and safety risk if not mitigated.

183. After the majority of the custodial staff were fired in Spring 2025, campus restrooms were untidy and did not have stocked toilet paper.

184. The restrooms had overflowing trash cans and overflowing disposal bins for used feminine hygiene products.

185. Ms. Bowen has observed that maintenance problems at Haskell have gotten worse since January 2025. During the 2026 spring semester, Ms. Bowen's residence hall suffered from significant maintenance problems. Trash containers regularly overflow on weekends. Rooms in the hall are contaminated with black mold. Haskell closed these mold-contaminated rooms, but did not clean or remediate them. Additionally, Ms. Bowen's hall had only two working showers for approximately 50 students.

186. Ms. Bowen has noticed a reduction in the number of janitorial staff at Haskell through the most recent semester.

187. Mr. Organista observed multiple water leaks and air conditioning outages in his dormitory during the Spring 2025 semester. His dormitory regularly had only two operational washing machines for approximately 100 students.

188. Mr. Organista's studying was repeatedly interrupted by power outages in the library during the 2025–26 school year.

189. Because BIE's workforce reduction eliminated all but one food service employee, students were forced to work without compensation to keep food services running.

190. As of the 2026 spring semester, food services continue to be reduced or neglected.

191. Reduced food service staff have also caused the cafeteria and lunchroom to become unclean and unwelcoming.

192. Students who would ordinarily use the lunchroom to spend time speaking with their classmates would now prefer to eat their meals alone in their dorm rooms.

193. Deans and other faculty have been forced to take over course loads of removed instructors without additional pay and at the expense of their primary workloads, and Kansas University sent an instructor over to assist with the class load of a laid off employee.

194. Mr. Organista lost a professor who taught three of his classes in Spring 2025. Mr. Organista's classes were taught by another humanities faculty member who lacked experience in the subject matter, a change that reduced the quality of Mr. Organista's classroom experience and lowered the quality of instruction in the class subject matters.

195. Other students have observed that faculty and deans covering classes for their fired colleagues provide a lower quality classroom and teaching experience due to their lack of expertise in the class subject matter.

196. Although some fired faculty were rehired as adjunct faculty, their firings and the temporary positions create significant uncertainty about future course offerings at Haskell.

197. There are additional staff who have not been rehired including maintenance, custodial, and operations staff, including the only bus driver at Haskell.

198. Preliminary reporting indicates that the instructor faculty will be rehired on an "adjunct" basis to finish the semester, and the rehiring does not include custodial or operations staff. The Haskell Student Success Center will remain closed. Kevin Abourezk, *Haskell rehires faculty lost to fed. layoffs*, INDIAN COUNTRY TODAY (Mar. 7, 2025), https://ictnews.org/news/haskell-rehires-faculty-lost-to-federal-layoffs?fbclid=IwY2xjawI3Y6BleHRuA2FlbQIxMQABHQfXVWkegOXN6ySuOf-OuHHb8JM2Nt3YArgii0LdYW85KHySiWZe2FOLGw_aem_DgFEmYGfeio2Pg5Tk-6-ig.

199. Additional and permanent rehiring is necessary to get Haskell fully operational.

200. BIE's workforce reduction and restructuring, and the resulting upheaval at Haskell, disrupted Plaintiff Danielle Ledesma's career plans. Ms. Ledesma was pursuing a social work degree in February 2025. She planned to take a course and complete volunteer requirements with a social work professor who was laid off in March 2025. BIE's disruption of Haskell's educational

environment, including the loss of Ms. Ledesma's social work professor, left her unable to obtain her social work degree. She was only able to complete the requirements for a liberal arts degree.

201. Similarly, Victor Organista's ability to complete his degree was jeopardized by the firings. The only professor who taught a communication class that Mr. Organista needed to graduate was fired. Haskell eventually tasked another professor, who already was busy with numerous classes, with teaching the communication class. The delay and uncertainty regarding his ability to graduate placed Mr. Organista and his family under mental strain. And the quality of Mr. Organista's education was undermined by replacing his professor with an overburdened and less experienced professor.

202. Due to the harms to student life, academics, student services, changes that imperil Haskell's accreditation, quality of education, and reputation, both Prairie Band Potawatomi Nation and the Cheyenne and Arapaho Tribes are reluctant to recommend Haskell to its students as a place of higher learning, despite having recommended Haskell to their students in the past.

203. The inability to recommend Haskell to their students harms Plaintiff Tribal Nations' interests in the education and welfare of their citizens.

204. The Cheyenne and Arapaho Tribes is particularly harmed by their inability to recommend Haskell as a post-secondary opportunity to their students because its students do not encounter other comparable, culturally appropriate opportunities in western Oklahoma.

**Harms to Student and Tribal Interests from workforce reduction and restructuring at SIPI**

205. The BIE operates SIPI, which provides science, technology, engineering, and mathematics education, along with other vocational and technical programs to Native American and Alaska Native students.

206. SIPI's mission is to "prepare[] our culturally diverse Native American students as life-long learners through partnerships with tribes, employers, and other organizations" and "establish

a strong education foundation for student success." SIPI, *Our History, Mission & Vision*, https://www.sipi.edu/apps/pages/history (last visited Aug. 25, 2026).

207. SIPI offers associate degree programs in accounting, business education, computer aided drafting and design, culinary arts, early childhood education, environmental science, geospacial information technology, liberal arts, natural resource management, network management, pre-engineering, and vision care technology. SIPI, *Programs and Degrees Offered*, https://www.sipi.edu/apps/pages/programs (last visited Aug. 25, 2026).

208. SIPI historically had approximately 92 total staff. In recent years it has served between 200–300 Native American and Alaska Native students a year.

209. Between the evenings of Thursday, February 13, and Friday February 14, 2025, BIE leadership and staff notified approximately 18 SIPI employees that their positions were terminated.

210. These employees were given a few hours to pack their belongings and vacate the premises. They were not provided with an opportunity to finish or transition their workloads.

211. These staff members provided essential services to the SIPI student body.

212. Eleven of these eliminated positions were student facing, including 9 instructors.

213. An additional 4 staff from SIPI were induced to accept deferred resignation.

214. Within a month of the RIFs, SIPI lost nearly a quarter of its staff, including professors teaching core curriculum classes.

215. These employees who were laid off were not let go based on performance of duties.

216. On March 6, 2025, a portion of the staff at SIPI was re-hired. Not all employees subjected to the BIE RIFs were rehired.

217. Between January 25 and July 12, 2025, BIE eliminated at least 5 percent of its staff at SIPI. GAO, *GAO-26-108673*, *supra*.

218. Interior Defendants determined, again without consultation, that they would not even attempt to replace the vast majority of departed employees.

219. As a result of BIE's workforce reduction and restructuring, the responsibility for SIPI's administration has shifted onto fewer and fewer shoulders as additional staff, motivated by the uncertainty and instability the RIFs caused, have departed from their roles. Remaining staff have taken on many responsibilities beyond their official roles. But despite the remaining staff's best efforts, the continued attrition of SIPI staff has negatively affected the services provided to SIPI students.

220. SIPI is accredited by the HLC, which sets specific standards for accreditation to ensure that institutions of higher education meet academic and operational requirements. *See* 25 U.S.C. § 2001. These standards cover multiple areas, such as mission and integrity, student learning and resources, and institutional effectiveness.

221. Personnel reductions may impact SIPI's accreditation if it impacts the institution's ability to provide quality education, meet student needs, or maintain operational effectiveness. HLC, *Current Criteria for Accreditation* (2020), *supra*.

222. These losses imperial the continued ability to function and accreditation of SIPI.

223. Due to these staff reductions, services provided to SIPI students were modified, curtailed, or eliminated.

**Harms to Student Life, Academics, Student Services, and Tribal Interests Resulting from Workforce Reduction and Restructuring at SIPI**

224. Plaintiff Kaiya Brown chose to attend SIPI because of its indigenous learning community. She found a vibrant and incredibly close-knit community at SIPI and has benefitted from the indigenous learning community and indigenous lens.

225. Ms. Brown observed that the firing of SIPI staff and BIE workforce reduction and restructuring immediately disrupted her classes and has impacted her educational experience.

226. In February and March of 2025, widespread confusion and fear resulting from the firings caused several of Ms. Brown's classes to be spent exchanging information on the firings and status of SIPI between students and teachers. Ms. Brown's instructors asked Ms. Brown and other students what they knew about the situation, spending valuable instruction time discussing the firings and the future of SIPI.

227. The firing of maintenance and security staff made SIPI's campus physically unsafe and unusable.

228. Between February 14, 2025 and March 2026, Ms. Brown's education was harmed by the workforce reduction.

229. Ms. Brown's classes were cancelled.

230. Two power outages on SIPI's campus were not promptly addressed due to the lack of maintenance staff available to restore the electricity. Ms. Brown was forced to leave her dorm residence and drive to a second location to be able to complete her school assignments during the first outage. The second power outage was campus-wide and caused classes to be cancelled.

231. Other maintenance issues went unaddressed or were addressed on a delayed schedule because of the lack of maintenance staff, including a burst water line, which left two SIPI campus buildings without running water for days.

232. Water from taps, showers, and laundry machines in Ms. Brown's dorm building is regularly unsafe and appears brown or black in color. As a result, for the time Ms. Brown resided in dorm residences, she did not drink water from her dorm building, cook in her dorm kitchen, or do laundry at her dorm.

233. The workforce reductions undermined plans by SIPI maintenance and administration had intended to address other maintenance issues. Before the firings, Residential Advisors promised Ms. Brown and others that SIPI would fix the problem. But after the firings, those same Residential Advisors told Ms. Brown and other dorm residents that the problem likely would not be fixed any time soon due to the lack of available staff.

234. The firings also negatively impacted SIPI students' access to extracurricular opportunities.

235. For example, SIPI notified its planned student delegation to the American Indian Higher Education Consortium ("AIHEC") annual student conference, which was held March 8–11, 2025, that they could no longer attend.

236. The delegation was subsequently notified that they could go, but were given only two days' notice before the event, effectively precluding them from making plans to travel and miss school and work.

237. Ms. Brown and other students missed out on a highly anticipated networking opportunity, for which she and others had already invested significant time in preparation.

238. The firings at SIPI occurred the week before midterm exams.

239. As a result, many students' midterm exams had no faculty to administer them.

240. Despite being fired from their positions and receiving no compensation for their work, fired instructors nevertheless volunteered their time to administer students' midterm exams.

241. Ms. Brown and other students, motivated by their exceptionally close and personal relationships with faculty and staff, started GoFundMe fundraisers so that the fired faculty members could pay their expenses.

242. If Ms. Brown and other students had not started these successful fundraisers to permit their fired faculty to pay their expenses, the fired faculty would not have had been able to volunteer their time to administer the students' midterm exams.

243. As a result of the firings, Ms. Brown experienced significant burdens on her ability to complete her two-year degree in early childhood education and liberal arts.

244. Ms. Brown was devastated by the firings. Her ability to complete her coursework and attend class has been negatively affected by the firings' impact on her mental health. She sought mental health counseling to protect her mental wellbeing.

245. Ms. Brown is aware that since the firings, some of her peers have struggled with suicidal thoughts and suicidal ideation.

246. Ms. Brown observed the loss of numerous faculty, deans, and support staff between January 2025 and March 2026.

247. In the spring semester of 2026, Ms. Brown was in need of but unable to access tutoring through the Academic Coaching Center and counseling support due to BIE's workforce reduction.

248. The reductions to SIPI support staff caused Ms. Brown's expected graduation date to slip to spring 2027.

249. The firings at SIPI have so significantly harmed the academic experience at SIPI that Ms. Brown describes the opportunity to pursue a Native-led post-secondary education as being "robbed" from her.

250. The Pueblo of Isleta's Department of Education historically consulted with SIPI to discuss curriculum that would be useful to the Pueblo, and routinely advises its Tribal members of the post-secondary educational opportunities available at SIPI.

251. Pueblo of Isleta members have previously attended SIPI and returned to Isleta and utilized their educations to benefit the Pueblo.

252. Due to the harms to student life, academics, student services, changes that imperil SIPI's accreditation, quality of education, and reputation, Isleta's Department of Education will no longer recommend students to certain SIPI programs and is concerned about recommending students to other programs until the school has been stabilized.

253. The inability to recommend SIPI to their students harms Isleta's ability to obtain appropriately culturally trained teachers and its interests in the education and welfare of its citizens.

**IMPACTS TO TRIBAL NATIONS**

254. Tribal Nations were not provided an opportunity to consult before Defendants executed BIE's workforce reduction and restructuring, including the reduction and restructuring at BIE, Haskell, and SIPI.

255. Tribal Nations were not provided an opportunity to consult before Defendants executed the Interagency Agreements.

256. Tribal Nations were never provided the opportunity to meaningfully consult regarding the workforce reductions, restructuring, reduced or eliminated education, changes at Haskell and SIPI, or the Interagency Agreements.

257. If Tribal Nations had been provided the opportunity to consult on these significant changes, they would have urged against the devastating reduction and elimination of BIE staff and related impacts to academics and student services.

258. In addition, if some reductions in force or restructuring were unavoidable and there had been the opportunity to consult, Tribal Nations would have consulted on their preferences and priorities for which academic programs and services should be protected from such reductions.

259. If Tribal Nations had been provided the opportunity to meaningfully consult on the Interagency Agreements, Tribal Nations would have engaged in an opportunity for meaningful consultation.

260. The reduction and restructuring of BIE's workforce interferes with BIE's ability to carry out its statutorily required functions and jeopardizes the continued functioning of BIE schools.

261. The Interagency Agreements have imposed additional confusion, expense, delay, and other injuries on Tribal Nations.

262. The Prairie Band Potawatomi Nation and Cheyenne and Arapaho Tribes are concerned that the firings at Haskell have caused classes to be cancelled and will cause future classes to be cancelled or not offered at all, possibly impacting the Tribe's students' full-time student status, their eligibility for financial aid, student housing, and the student meal plan.

263. The Prairie Band Potawatomi Nation and Cheyenne and Arapaho Tribes are concerned that the workforce reduction and restructuring and the Interagency Agreements are causing Haskell to decrease admissions and are jeopardizing Haskell's accreditation and continued existence.

264. The Cheyenne and Arapaho Tribes use a Native Youth Community Projects ("NYCP") grant issued by Education and a Tribal Education Department ("TED") grant issued by BIE to fund activities related to education. These grants are not being administered adequately. The NYCP grant has been administered by three different specialists since October, creating inefficiency and confusion. BIE failed to respond to the Tribes' questions regarding the TED grant between November and August, 2026.

265. The Cheyenne and Arapaho Tribes sought another Department of Education grant for additional capacity building, the application for which was due on June 11, 2026. Interior stated that the Tribes were ineligible for this grant because: 1) the grant was transferred from Education to Interior; and 2) the Tribes cannot apply for two capacity building grants that are housed under the same agency. The Interagency Agreements and transfer of functions from Education to Interior thus undermined the Tribes' efforts to fund its education system.

266. Isleta depends on funding from Interior to provide educational services to Isleta members at Isleta Elementary School. BIE's experienced staff provided important support and technical assistance to access this funding.

267. Organizational and staffing changes at Interior since January 20, 2025 have increased the level of confusion and disorganization regarding funding for Isleta's school programs, made Isleta's receipt of funds more uncertain, and made it more difficult for Isleta to obtain funds that Interior is required to pay Isleta pursuant to contracts or grants. Interior's communication regarding educational funding has grown sporadic. Isleta lacks stable contacts at Interior to resolve questions regarding funding and to process payments in a timely manner. Isleta is often unsure of who the appropriate contact is for its questions relating to funding Isleta elementary. At one point following in 2025, Isleta's contact at Interior for education funding appeared to be the Southern Pueblos Agency's Fire Management Office. Interior's loss of experienced employees has required Isleta to provide duplicative and burdensome justifications to support many payments. And Interior's recent communication of funding and contract modifications in a disorganized manner makes it difficult for Isleta to track responses to Isleta's individual funding requests.

268. Many Isleta Elementary School students receive special education services. Inconsistency in staffing and funding delays make it more challenging for Isleta to provide these vital services. For example, Isleta must share one special education teacher with another Pueblo.

269. On July 21, 2026, BIE informed Isleta that a portion of funding for its early childhood programs for children with learning disabilities was "on hold" and that BIE "do[es] not have an anticipated release date for those funds." Letter from K. Thomas to Gov. Jiron (July 21, 2026) *available at* https://narf.org/nill/documents/20260721-funding-isleta-letter.pdf. The funds have not yet been released.

270. Interior Defendants' organizational and staffing changes have delayed Isleta's receipt of funding. These delays force Isleta to expend additional effort to obtain funds due to it and cover certain expenses while waiting for delayed federal funds.

271. Isleta and its members are fearful that the reduction of staff at BIE, plans for future staff reductions, hiring restrictions, and the Interagency Agreements will further impact Isleta Elementary School.

272. Because Isleta depends on funding continuity and regularity to plan its budget and pay its bills, this decrease in reliability undermines Isleta's ability to plan and weakens Isleta's ability to provide high-quality education and support. The workforce reduction and restructuring and Interagency Agreements thus harm Isleta, its members, its students, its faculty, and its staff.

## COUNT ONE

### Declaratory Judgment that Interior Defendants Failed to Consult with Tribes as Required by 25 U.S.C. §§ 2003 and 2011 (against Interior Defendants)

273. All foregoing paragraphs are incorporated as if set forth fully herein.

274. BIE and the Assistant Secretary-Indian Affairs are required to consult with affected Tribes under 25 U.S.C. § 2003 before establishing new BIE policies or changing or modifying existing BIE policies.

275. Interior Defendants are required to consult with affected Tribes before taking any action regarding Indian education pursuant to 25 U.S.C. § 2011.

276. BIE's RIFs and firing of BIE probationary employees constitutes the establishment of new BIE policies or changing or modifying existing BIE policies and actions regarding Indian education pursuant to 25 U.S.C. §§ 2003 and 2011.

277. Any portion of Interior's ARRP impacting BIE constitutes new BIE policies or changing or modifying existing BIE policies and actions regarding Indian education pursuant to 25 U.S.C. §§ 2003 and 2011.

278. These workforce reductions and restructuring were decisions made and actions taken by Defendants without consultation with affected Tribes under 25 U.S.C. §§ 2003 and 2011.

279. Defendants' execution and implementation of the Interagency Agreement with Education constitute the establishment of new BIE policies or changing or modifying existing BIE policies and actions regarding Indian education pursuant to 25 U.S.C. §§ 2003 and 2011.

280. Defendants' execution and implementation of the Interagency Agreement with Education were decisions made and actions taken by Defendants without consultation with affected Tribes under 25 U.S.C. §§ 2003 and 2011.

281. 25 U.S.C. §§ 2003 and 2011 guarantee Tribal Nations the right of pre-decisional and pre-action consultation.

282. Because of the failure to consult, Tribal Nations have suffered the loss of their statutory consultation rights and have suffered other harms, including harms to their Tribes, their schools, their students and parents, and their education.

283. Tribal Nations are entitled to a declaratory judgment that the BIE workforce reduction and restructuring, and the Interagency Agreement between Education and Interior, were taken without consultation with affected Tribes in violation of 25 U.S.C. §§ 2003 and 2011(b).

## COUNT TWO

### Injunction Compelling Consultation with Tribes as Required by 25 U.S.C. §§ 2003 and 2011 (against Interior Defendants)

284. All foregoing paragraphs are incorporated as if set forth fully herein.

285. Defendants' failure and continuing failure to consult with affected Tribes under 25 U.S.C. § 2003 before establishing new BIE policies or changing or modifying existing BIE policies, and under § 2011 before taking any action regarding Indian education pursuant to 25 U.S.C. § 2011, have caused and will continue to cause Tribal Nations irreparable injury in terms of the loss of their statutory procedural rights, as well as harms to their Tribes, schools, students and parents, and education.

286. Tribal Nations are entitled to injunctive relief setting aside and voiding Defendants' actions taken in violation of the tribal consultation requirements of 25 U.S.C. §§ 2003 and 2011, including BIE's RIFs, firing of BIE probationary employees, and the Interagency Agreement between Interior and Education because these actions constitute the establishment of new BIE policies or changing or modifying existing BIE policies and actions regarding Indian education pursuant to 25 U.S.C. §§ 2003 and 2011.

287. Tribal Nations are entitled to injunctive relief requiring Defendants to cease making decisions and taking actions in violation of the consultation requirements of 25 U.S.C. §§ 2003 and 2011, including enjoining Defendants from taking any further actions regarding Indian education without conducting consultation.

288. Tribal Nations are entitled to injunctive relief requiring Interior Defendants to abide by their obligations and consult with affected Tribes as required by 25 U.S.C. §§ 2003 and 2011(b).

## COUNT THREE

### Administrative Procedure Act – 5 U.S.C. § 706(2)(A)
### Agency Action Not in Accordance With Law
### (against Interior Defendants)

289. All foregoing Paragraphs are incorporated as if set forth fully herein.

290. The BIE RIFs, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreement between Interior and Education constitute final agency actions subject to review under the APA.

291. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be[ ] . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

292. Defendants are required to consult with affected Tribes under 25 U.S.C. § 2003, U.S.C. § 2011, and agency policy and regulations before establishing new BIE policies or changing or modifying existing BIE policies or taking actions regarding Indian education.

293. BIE's RIFs, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreement between Interior and Education constitute the establishment of new BIE policies or changing or modifying existing BIE policies.

294. Defendants' BIE RIFs, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreement between Interior and Education were decisions made and actions taken by Defendants without consultation with affected Tribes under 25 U.S.C. §§ 2003 and 2011 and governing policies.

295. Defendants' actions establishing new BIE policies or changing or modifying existing BIE policies violation without consulting with Tribal Nations contravene 25 U.S.C. §§ 2003 and 2011.

## COUNT FOUR

**Injunction Compelling Consultation with Tribes**
**as Required by 25 U.S.C. §§ 2003 and 2011 and governing policies**
**Under APA – 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance With Law**
**(against Interior Defendants)**

296. All foregoing paragraphs are incorporated as if set forth fully herein.

297. Defendants' repeated failure to consult with affected Tribes under 25 U.S.C. § 2003 before establishing new BIE policies or changing or modifying existing BIE policies, and under § 2011(b) before taking any action regarding Indian education under applicable laws as set forth in 25 U.S.C. § 2011, have caused and will continue to cause Tribal Nations injury in terms of the loss of their statutory procedural rights and other harms to their Tribes, schools, students and parents, and education.

298. Tribal Nations are entitled to injunctive relief setting aside and voiding the BIE RIFS, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreement between Interior and Education implemented in violation of the Tribal consultation requirements of 25 U.S.C. §§ 2003 and 2011.

299. Tribal Nations are entitled to injunctive relief requiring Defendants to cease making decisions and taking actions in violation of the tribal consultation requirements of 25 U.S.C. §§ 2003 and 2011, including enjoining Defendants from implementing any further RIFs and restructuring at BIE, mass firings at BIE, offering retirement and resignation programs to BIE employees, and the execution and implementation of Interagency Agreement ARRPs, or other actions aimed at reducing or restructuring the Indian education workforce absent required tribal consultation.

300. Tribal Nations are entitled to injunctive relief requiring Defendants to abide by their statutory obligations and consult with affected Tribes as required by 25 U.S.C. §§ 2003 and 2011.

## COUNT FIVE

**Declaratory Judgement of Violation of APA – 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance With Law**
**(25 U.S.C. § 2003)**
**(against Interior Defendants)**

301. All foregoing paragraphs are incorporated as if set forth fully herein.

302. The BIE RIFs, firing of BIE probationary employees, the execution and implementation of the Interagency Agreement between Interior and Education, and the execution and implementation of the Interagency Agreement between Interior and Education constitute final agency actions subject to review under the APA

303. 25 U.S.C. § 2003 provides "[t]he provisions of part 32 of title 25, Code of Federal Regulations, as in effect on January 1, 1987, are incorporated into this Act and shall be treated as though such provisions are set forth in this subsection."

304. The incorporated regulation 25 C.F.R. § 32.4(a)(3) mandates that "Indian Tribes and Alaska Native entities fully exercise self-determination and control in planning, priority-setting, development, management, operation, *staffing* and evaluation in all aspects of the education process." (emphasis added).

305. The BIE RIFs, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreement between Interior and Education violated 25 C.F.R. § 32.4(a)(3).

306. The incorporated regulation § 32.4(r)(2) "[e]xtend[s] to Tribes and Alaska Native entities the prerogative of determining those critical professions and fields of study in post-secondary education which are of the highest priority to meet their economic and cultural goals."

307. The BIE RIFs, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreement between Interior and Education violated § 32.4(r)(2).

308. The incorporated regulation 25 C.F.R. § 32.4(r)(1) "[e]nsure[s] to the extent possible that all students who choose to pursue career and post-secondary education, including but not limited to, undergraduate and graduate programs, or preparation for skilled trades, receive

adequate academic or other preparation, at the schools of their choice, assuring that students are provided adequate support services to enable them to meet their educational goals."

309. The BIE RIFs, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreement between Interior and Education violated § 32.4(r)(1).

310. The incorporated regulation 25 C.F.R. § 32.4(s)(2) requires that BIE "[m]aintain all school and residential facilities to meet appropriate Tribal, State or Federal safety, health and child care standards."

311. The BIE RIFs, firing of BIE probationary employees, and the execution and implementation of the Interagency Agreement between Interior and Education violated § 32.4(s)(2).

312. The incorporated regulation 25 C.F.R. § 32.4 (k)(1) requires that BIE "[s]erve as an advocate for Indian Tribes and Alaska Native entities in education matters before the Federal . . . government[]."

313. The BIE RIFs and restructuring, and the execution and implementation of the Interagency Agreement between Interior and Education were detrimental and contrary to BIE's *Strategic Direction* and BIE failed to advocate for AI/AN Tribes before the federal government in violation of 25 C.F.R. §32.4(k)(1).

314. Tribal Nations and Individual Students are entitled to a declaratory judgment that the BIE RIFs and restructuring violated 25 U.S.C. § 2003.

## COUNT SIX

**Injunction Compelling Consultation with Tribes as Required by 25 U.S.C. § 2003**
**APA – 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance With Law**
**(against Interior Defendants)**

315. All foregoing paragraphs are incorporated as if set forth fully herein.

316. Defendants' failure and continuing failure to follow the regulations codified by 25 U.S.C. § 2003 have caused and will continue to cause Tribal Nations injury in terms of the loss of their statutory procedural rights and in terms of other harms to their Tribes, schools, students and parents, and education.

317. Pursuant to 5 U.S.C. § 706(2)(A), actions contrary to law should be voided and set-aside.

318. Tribal Nations and Individual Students are entitled to injunctive relief setting aside and voiding the BIE RIFs, firing of BIE probationary employees, and the Interagency Agreement between Interior and Education because these actions constitute the establishment of new BIE policies or changing or modifying existing BIE policies and actions regarding Indian education implemented in violation of 25 U.S.C. § 2003.

319. Tribal Nations and Individual Students are entitled to injunctive relief requiring Defendants to cease making decisions and taking actions in violation of 25 U.S.C. § 2003, including enjoining Defendants from implementing any further RIFs or developing ARRPs absent required tribal consultation.

320. Tribal Nations and Individual Students are entitled to injunctive relief compelling Defendants to abide by their statutory obligations required by 25 U.S.C. § 2003.

## COUNT SEVEN

### Declaratory Judgement of Violation of APA – 5 U.S.C. § 706(2)(A)
### Agency Action That Is Arbitrary and Capricious and An Abuse of Discretion
### (Interior and Education Defendants)

321. All foregoing paragraphs are incorporated as if set forth fully herein.

322. The BIE RIFs, firing of BIE probationary employees, the execution and implementation of the Interagency Agreement between Interior and Education, and the execution

and implementation of the Interagency Agreement between Labor and Education are arbitrary and capricious in numerous respects.

323. Under the APA, a court shall "hold unlawful and set aside agency action … found to be[] . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

324. The BIE RIFs and firing of BIE probationary employees was made largely without regard to the positions that the employees occupied.

325. The BIE RIFs, firing of BIE probationary employees, and the Interagency Agreement between Interior and Education, exacerbate Defendants' problems delivering Indian educational services.

326. Interior officials did not analyze projected cost savings prior to acting through the BIE RIFs, firing of BIE probationary employees, or the Interagency Agreement between Interior and Education exacerbate Interior's problems delivering Indian educational services.

327. Interior officials did not analyze the potential impacts on Indian education of the BIE RIFs, firing of BIE probationary employees, or the Interagency Agreement between Interior and Education exacerbate Interior's problems delivering Indian educational services.

328. Interior did not comply with its consultation policy or engage in meaningful consultation prior to acting through the BIE RIFs, firing of BIE probationary employees, or the Interagency Agreement between Interior and Education.

329. Education did not comply with its consultation policy or engage in meaningful consultation prior to executing and implementing the Interagency Agreement between Interior and Education or the Interagency Agreement between Labor and Education.

330. In executing and implementing the Interagency Agreements, Defendants failed to consider the impact on institutional knowledge, technical expertise, continuity of services, and

other potential harms from such transfers, as well as many of Tribal Nations' comments in the post-hoc "consultation" process.

331. The BIE RIFs, firing of BIE probationary employees, the Interagency Agreement between Interior and Education, and the Interagency Agreement between Labor and Education fail to acknowledge the practical consequences that they will produce, let alone provide a reasonable explanation why those consequences possibly could be warranted. To say that the actions "entirely failed to consider an important aspect of the problem," *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), where the actions did not even recognize the obvious and immediate harm and disruption they will occasion is to dramatically understate the extent to which the Defendants' actions are arbitrary and capricious.

332. Defendants' decisions are inconsistent with the evidence before the agency. For example, numerous GAO reports established a need for more, not less, BIE employees. Defendants nonetheless decimated BIE's staff, thereby undermining the Indian education system and placing Haskell and SIPI's accreditation and their students' education in jeopardy.

333. The BIE RIFs and firing of BIE probationary employees also fail to account for the substantial reliance interests that Tribal Nations, students, families, and employees have in the BIE's Strategic Direction, which all has been swept away. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account,'' and the failure to do so is arbitrary and capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

334. Firing probationary employees without regard to the positions they hold, and without warning or ability to transition workload, is contrary to GAO reports and recommendations and the BIE's own documents regarding BIE staffing needs. Indeed, additional resources likely will be

needed to remedy the damage done by these sudden, unplanned departures. The BIE RIFs and restructuring were therefore arbitrary and capricious and should be set aside.

335. Additionally, recruitment and retention of staff consistently has been identified as a challenge for BIE. Eliminating probationary staff means the loss of employees that will be difficult to replace and will only make recruitment harder, since the layoffs were executed without warning and without cause.

336. Given these agency specific challenges, the BIE RIFs and firing of BIE probationary employees were arbitrary and capricious and should be set aside.

337. The BIE RIFs, firing of BIE probationary employees, the Interagency Agreement between Interior and Education, and the Interagency Agreement between Labor and Education were likewise arbitrary and capricious because they had no rational relationship to the goal of reduced government spending and were not supported by reasoned decision making.

338. Firing of probationary employees included positions critical to BIE's operations and ability to fulfill GAO's recommendations and BIE's own *Strategic Direction*. For example, fiscal accountants, instructors, safety officers, and building inspectors were laid off, despite these positions being critical to BIEs progress. The abandonment of their previous *Strategic Direction* and disregarding GAO's recommendations are arbitrary and capricious actions and an abuse of discretion and should be set aside.

339. The Interagency Agreement between Interior and Education and the Interagency Agreement between Labor and Education also arbitrarily and capriciously add layers of bureaucracy to the Indian Educational Process.

340. Defendants did not consider more limited alternatives designed to improve government efficiency and operations or offer a reasoned explanation for their actions.

341. Defendants actions impede, rather than support, their ability to support Indian education.

342. These cuts to BIE staff interfere with BIE's ability to carry out its statutorily required functions.

343. Tribal Nations are entitled to a declaratory judgment that the BIE RIFs, firing of BIE probationary employees, the Interagency Agreement between Interior and Education, and the Interagency Agreement between Labor and Education were agency actions that were arbitrary and capricious and an abuse of discretion.

**COUNT EIGHT**

**Injunction Compelling Defendants to Cease Violations of APA – 5 U.S.C. § 706(2)(A)**
**Agency Action That Is Arbitrary and Capricious and An Abuse of Discretion**
**(Interior and Education Defendants)**

344. All foregoing paragraphs are incorporated as if set forth fully herein.

345. Defendants' arbitrary and capricious implementation of BIE RIFs, firing of BIE probationary employees, the Interagency Agreement between Interior and Education, and the Interagency Agreement between Labor and Education have caused and will continue to cause Tribal Nations irreparable injury in terms of harms to their Tribes, schools, students and parents, and education.

346. Tribal Nations and Individual Students are entitled to injunctive relief setting aside and voiding the BIE RIFs, firing of BIE probationary employees, the Interagency Agreement between Interior and Education, and the Interagency Agreement between Labor and Education.

347. Tribal Nations and Individual Students are entitled to injunctive relief compelling Defendants to cease implementing the challenged arbitrary and capricious actions.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

a. Issue a declaratory judgment that the BIE RIFs, induced resignations, restructuring, firing of BIE probationary employees, and the Interagency Agreement between Interior and Education violate 25 U.S.C. §§ 2003 and 2011 because they were made without the required tribal consultation and are otherwise contrary to law.

b. Issue a declaratory judgment that the BIE RIFs, induced resignations, restructuring, firing of BIE probationary employees, and the Interagency Agreement between Interior and Education are unlawful and must be set aside under the Administrative Procedure Act;

c. Issue an injunction barring Interior Defendants and all of their officers, employees, and agents from taking any steps to direct, implement, or demand adherence to the BIE RIFs implemented in February 2025 and the firing of BIE's probationary employees.

d. Declare unlawful and set aside the Department of Education's interagency agreements with the Department of the Interior and the Department of Labor as arbitrary, capricious, an abuse of discretion, not in accordance with law, or without observance of procedure required by law under 5 U.S.C. § 706(2) and otherwise violative of 25 U.S.C. §§ 2003 and 2011.

e. Declare unlawful and set aside actions by the Department of the Interior, Department of Education, or Department of Labor to implement the interagency agreements as arbitrary, capricious, an abuse of discretion, not in accordance with law, or without observance of procedure required by law under 5 U.S.C. § 706(2) and otherwise violative of 25 U.S.C. §§ 2003 and 2011.

f. Issue an injunction barring Interior Defendants and all of their officers, employees, and agents from taking any steps to direct, implement, or demand additional RIFs, induced resignations, or restructuring relating to Indian education without prior consultation with American Indian/Alaska Native Tribes.

g. Issue an injunction barring Defendants and all of their officers, employees, and agents from taking any additional steps to implement Education's Interagency Agreements with Interior and Labor or execute new interagency agreements relating to Indian education without prior consultation with American Indian/Alaska Native Tribes.

h. Declare unlawful and set aside any restriction or condition on filling positions at the BIE and Office of Indian Education.

i. Issue an injunction compelling Defendants to conduct the required consultations with American Indian/Alaska Native Tribes, including consultation prior to any future potential workforce reduction or execution or implementation of an interagency agreement.

j. Issue an injunction compelling Defendants to post job openings for and attempt to fill all positions at the BIE and Office of Indian Education, including at Haskell and SIPI, that were occupied on January 25, 2025 and are currently unoccupied.

k. Retain continuing jurisdiction to supervise and effectuate Defendants' adherence to and implementation and achievement of the relief granted.

l. Award Plaintiffs their costs of suit, including, without limitation, attorneys' fees, and other costs under applicable law and equity.

m. Grant such other relief as the Court deems necessary, just, and proper.

Dated: August 27, 2026.

*/s/ Matthew Marinelli*
Matthew Marinelli
DC Bar No. 488351
marinelli@narf.org

NATIVE AMERICAN RIGHTS FUND
950 F Street, NW, Suite 1050,
Washington, DC 20004

Matthew Campbell
Jacqueline De León
Malia Gesuale
NM Bar No. 138207, CO No. 40808
DC Bar No. 1023035, CA Bar No. 288192
CO Bar No. 59452
mcampbell@narf.org
jdeleon@narf.org
gesuale@narf.org

NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302

*Counsel for Plaintiffs*